JACOBS ET AL. *v.* COUNTY BOARD OF APPEALS FOR BALTIMORE COUNTY ET AL.

[No. 249, September Term, 1963.]

244

*Decided April 1, 1964.*

The cause was argued before HENDERSON, HAMMOND, PRESCOTT, HORNEY and SYBERT, JJ.

*W. Lee Harrison,* with whom were *Richard C. Murray* and *Smith & Harrison* on the brief, for the appellants.

*Robert L. Sullivan, Jr.,* and *Allan J. Malester,* with whom were *Sklar & Sullivan* on the brief, for the appellees.

PRESCOTT, J., delivered the opinion of the Court.

In this zoning case, neighboring residents appeal from an order of the Circuit Court for Baltimore County, which affirmed the decision of the County Board of Appeals (Board), which, in turn, had sustained the action of the Zoning Commissioner, in granting a permit, pursuant to Section 409.4 of the Zoning Regulations, to use property zoned "residential" for off-street parking for a proposed neighborhood shopping center.

Two questions are presented by the appellants: (1) Did the Board err in granting permission to use 8½ acres of residential property for parking in a shopping center yet to be constructed?; and (2) Did the Board improperly "abdicate" its powers in favor of the County Planning Board?

The subject "B-L" (Business Local) property is located several hundred feet south of Smith Avenue, (a 20-foot wide highway), opposite its intersection with Laurelwood Avenue, and represents a portion of what was formerly known as the Curtiss-Wright Airport. The property, as defined by the Land Use Map of 1957, was (and is) surrounded by "R-6" residential land with no access to major arteries. The "B-L" area was the former site of the airport hangars. After the discontinuance of the airport, the hangars were used by Bendix for industrial uses, and its utilization of same predated the residential development on the north side of Smith Avenue.

The community to be served by the proposed shopping center was described by Mr. Klein, a witness for the applicant, as being bound on the north by Midfield Road, approximately one half mile north of the subject property; on the east by Bonnie

View Country Club, about one mile to the east; on the south by Cross Country Boulevard, approximately three-quarters of a mile distant; on the west by Seven Mile Lane, a distance of about one mile. There are approximately 3,500 families in the community and it was estimated that there would be, within five years, by reason of the Pickwick residential development on adjacent county property and an apartment house development on the Baltimore City portion of the former Curtiss-Wright Airport property, a total of 6,000 families living within the community, as described above.

The petition was ably and carefully presented to the Board. Moving pictures were shown depicting various aspects of the community, such as the dwellings therein, and school children crossing streets, etc. A consulting engineer disclosed that the proposed plan of the shopping center had been adopted after consideration of many different possibilities. The contemplated use embraced a food market, drug store, variety store and "a complement of smaller-type-stores," consisting altogether of some ten to fifteen stores. It was shown that Smith Avenue in front of the subject property would be widened to the width of 58 feet, at the complete expense of the applicant.

· The principal access to the shopping center will be by a "monumental" entrance and by a supplemental entrance and exit from Smith Avenue at the east and west side of the center. Additional access was shown from certain proposed interior roads (at the time of the hearing, plats depicting said roads were on file with the County Department of Public Works).

The Board stated, *inter alia,* that there was no "traffic problem inherent or arising from the use sought," and that the "petitioner [had] presented a fine over-all general development plan for the subject site which would not adversely affect any aspect of the public health and welfare, but would serve a need that now exists." It granted the Use Permit subject to the following restrictions: (1) a 60 foot setback from Smith Avenue to provide a lawn area; (2) construction of a stone or masonry wall around a portion of the property; (3) that the shields and diffusion of the shopping center parking lights be permanently focused on the parking area; and (4) that ingress and egress to the parking area be subject to the approval of the County Planning Board.

I

It would subserve no useful purpose to set forth the facts in greater detail. Able and experienced counsel for the appellants do not make the main thrust of their argument a claim that there was no substantial evidence to support the action of the Board under ordinary circumstances. They argue that under the construction given by this Court to Section 409.4 [1] of the Zoning Regulations in *Marek v. Board of Appeals,* 218 Md. 351, 146 A. 2d 875, Section 409.4 can only be brought into play by the Board in "unusual or unique" situations, not present in the instant case.

Before considering this argument, we will state there was substantial credible testimony to the effect that the granting of the Use Permit would fill a public need; that the public would be benefited thereby; and that all of the "conditions" named in Section 409.4 would be met. There was also testimony to the contrary, which included testimony that there were already several shopping centers located about a mile from the subject property. We hold that the evidence adduced by the applicant rendered the action of the Board, at least, fairly debatable; hence such action cannot be said to be arbitrary or capricious in a legal sense.

We return to the main thrust of appellants' argument, which seems to be two pronged. First, they contend that a proper construction of Section 409.4 limits its application to *existing commercial operations,* and, since there is no present, existing commercial operation in the case at bar but only one anticipated in the *future,* the Board misinterpreted said section in granting the Use Permit, which, in effect, would raise some three acres of B.L. zoning to eleven and one-half acres. There is nothing in Section 409.4 which limits its application to existing commercial operations. And it is universally recognized, in those

---

1. Section 409.4, in part, reads as follows: "—Business or Industrial Parking in Residence Zones—Upon application the Zoning Commissioner may issue a use permit for the use of land in a residential zone for parking areas subject to the following conditions. If granted, such use permit shall be conditioned as follows * * *." There follow eight conditions numbered a through h. The conditions pertinent herein will be set forth later as needed.

jurisdictions where zoning has been established, that zoning is not static, and the zoning authorities, either in adopting a comprehensive zoning plan or in granting a reclassification, may take into consideration needs of the reasonably foreseeable future.

This phase of appellants' argument is, we think, answered by the case of *Town of Somerset v. County Council*, 229 Md. 42, 181 A. 2d 671. There, land had been zoned residential since 1928 (apparently the first zoning in the State). It had a frontage of 1,000 feet on an arterial highway with a depth of 250 feet. It was leased to a department store company, which proposed to build an attractive store thereon, provided proper rezoning classification could be obtained. Application was made, and granted, for a reclassification of a portion of the land with a frontage of 250 feet by a depth of 200 feet, upon which the store was to be built, from its residential classification to C-2 (general commercial), with the balance of the property remaining residential, subject to a special exception (we held in *Marek, supra,* that the Use Permits granted under Section 409.4 did not constitute "special exceptions") to allow off-street parking. We upheld this action of the County Council of Montgomery County, noting that the technique of granting a special exception for the off-street parking permitted the imposition of conditions upon the use of the land for the protection of surrounding property owners.

Should we adopt the construction of Section 409.4 here suggested by the appellants, a most unusual, peculiar, and undesirable result would be reached, as is illustrated by the facts herein. No matter how great the public need for a larger building might be, if a Use Permit for off-street parking were required to be predicated upon an *existing* commercial *operation,* the applicant herein could not obtain any building permit (in the absence of reclassification), without reserving the required amount of parking space on his land zoned B-L, which obviously would result in only a portion of the land being utilized for the building. And if the smaller building were erected with the proper parking space reserved for a building of that size there would exist no need for an additional parking area. Patently, this would weaken the effectiveness of zoning in one

of its fundamental purposes: to accomplish what is good for, and beneficial to, the general public.

We hold that Section 409.4 is not limited in its application to existing commercial operations.

Much of what has been said above applies to appellants' second argument under this heading. They say that we stated in *Marek, supra,* that the purpose of Section 409.4 was to provide for "unusual conditions," which would justify the lifting or easing of general restrictions if "the general public good" would thereby be attained, and contend that there were no unusual factors in this case and that no public good was attained thereby. We reaffirm our decision in *Marek.* We used the words "unusual conditions" to denote conditions that were not common nor ordinary, but not that they had to be extremely rare or unique. The property of applicant zoned B-I, is completely surrounded by residentially zoned property and it has no access to a major arterial highway. The Board (supported by substantial evidence) found that the "need [for an additional shopping center] [arose] with an almost explosive impact," and that "these changes [in communities] occur with a rapidity that in some cases staggers the imagination." We noted above that the Board found that the granting of the permit would fill a public need and the public would be benefited thereby. These facts readily bring the case at bar within the scope of our decision in *Marek, supra.*

II

Under this heading, appellants assert that condition d of Section 409.4 required the Board to fix the "hours of illumination," condition h required the Board to fix the "permitted hours of use [of the area]," which the Board failed to do, and, in addition, the Board abdicated its powers when it inserted in its order the provision "ingress and egress to the parking area to be *subject to the approval* [italics ours] of the County Planning Board."

These contentions may be answered without elaborate discussion. Condition d provides that "lighting shall be regulated as to location, direction, hours of illumination, * * * *as required* [emphasis ours]." The evidence before the Board disclosed that no light rays would be focused toward the residences, and

the Board's order included this as one of its conditions upon which the use was permitted. With this condition present, the Board evidently came to the conclusion that, under the circumstances of this case, the hours of illumination were not "required" to be "regulated." Condition g states: "A satisfactory plan showing parking arrangement and vehicular access must be provided. Said plan *shall also be approved by the Office of Planning* [italics again ours]." Petitioner's evidence at the hearing before the Board, as we indicated above, showed in detail the planned arrangement for vehicular access to the property. We construe the language used in the Board's order relative to Planning approval to be no more than a compliance with condition g, above quoted, requiring Planning Board approval of the plan already approved by the Board. Condition h provides: "Method and area of operation, * * * and permitted hours of use shall be specified, and regulated as required." Here, again, we think the failure of the Board to designate the "permitted hours of use" meant merely that the circumstances here presented did not, in the opinion of the Board, require that such hours be specified or regulated.

*Order affirmed, with costs.*