MacDONALD, et al. *v.* BOARD OF COUNTY COM-
MISSIONERS FOR PRINCE GEORGE'S COUNTY
AND ISLE OF THYE LAND COMPANY

[No. 427, September Term, 1964.]

550

*Decided May 5, 1965.*
*Dissenting Opinion filed May 25, 1965.*

The cause was argued before HAMMOND, MARBURY, SYBERT, OPPENHEIMER and BARNES, JJ.

*James Vance,* in proper person, and *George E. Burgess,* with whom were *Meloy & Burgess* on the brief, for appellants.

*Robert B. Mathias,* with whom was *Lionell M. Lockhart* on the brief, for Board of County Commissioners of Prince George's County, Md., part of appellees; *Charles F. Finley,* with whom were *Blair H. Smith* and *Herbert Reichelt* on the brief, for Isle of Thye Land Company, other appellee.

Brief *Amicus Curiae* filed by the United States. *J. Edward Williams, Acting Assistant Attorney General, Roger P. Marquis* and *Edmund B. Clark, Attorneys, Department of Justice,* Washington, D. C., on the brief.

OPPENHEIMER, J., delivered the majority opinion of the Court. BARNES, J., dissented. Dissenting opinion at page 557 *infra.*

Adjacent property owners appeal from an order of the Circuit Court for Prince George's County affirming a zoning action of the Board of County Commissioners for Prince George's County, sitting as a District Council for the Prince George's portion of the Maryland-Washington Regional District (the Council). The Council had approved applications of the Isle of Thye Land Company, one of the appellees (the Land Company), to reclassify three tracts of land all zoned R-R (Rural Residential). Two tracts of approximately nine and three acres respectively were rezoned to C-2 (General Commercial) and the third, of about 29 acres, to R-H (Multiple Family, High Rise Residential).

The three tracts are part of a larger area of 655 acres owned by the Land Company, called Tantallon on the Potomac, located

in the southwestern portion of the County, on Swan Creek, which empties into the Potomac. The Woodrow Wilson Bridge and the Capital Beltway are four or five miles to the north. Fort Washington National Park, a 341 acre reservation, is adjacent to the area on the south and Mount Vernon is across the Potomac River to the west.

All the area is included in the Washington-Maryland Regional District and was zoned R-R by the Council on November 20, 1957. The rezoning applications here involved were filed on June 14, 1962 and later amended.[1]

The technical staff of the Planning Commission recommended denial of all three applications. Its amended report stated, in part:

> "The staff, in its review of this application, concludes that the granting of any zone on this property other than the existing R-R Zone, would be spot zoning. The development which has occurred in the area has been that of single family dwellings on larger than minimum lot size standards, and, the changes which have occurred in this area, the Tantallon community included, are a continuation and solidification of this pattern. * * *"

The Planning Board recommended denial of the R-H rezoning for the reasons given by its technical staff. The Board, however, recommended that the two commercial rezonings (as to the nine and three acre tracts) be approved, stating:

> "The Board feels that the subject properties are ideal locations for a marina and restaurant and, further, that such proposed uses would be in keeping with the low-density pattern of development proposed in the Preliminary General Plan for this area."

---

1. As to the 29 acres, the original application asked for a rezoning to the R-10 classification (Multi-Family, Medium Density, Residential). On November 10, 1962, a new zoning classification was adopted, the R-H zone, and the application as to the 29 acres was amended to apply to the new zone. The report of the technical staff, as to the 29 acres, was amended after the application had been amended.

At the hearing before the Council, the expert witnesses of the Land Company offered voluminous and plausible testimony as to the attractive nature of the plans for the area which it owns. It claimed but offered no evidence to support a mistake in the Master Zoning Map. It relied, instead, upon claimed substantial changes in the area since the adoption of the comprehensive zoning map. The nature of the alleged changes will be considered hereafter. The Chief Engineer of the Planning Commission elaborated upon the reports of the technical staff, and testified that the changes that had occurred in the area of the Land Company's property were oriented towards low density, single family development. Neighboring and adjacent property owners, including the appellants, presented testimony in opposition to the reclassifications, with letters from other protestants, including Secretary of the Interior Udall.[2]

The Council, one of the Commissioners dissenting, approved all three of the Land Company's applications for rezoning. The formal notice of the Council gave no reasons for its decision. The only statement in the nature of reasons is contained in what appears to be a press release on behalf of the Council. This release, apart from some extraneous remarks, contained the following statements:

> "Commissioner Brooke, in making his motion, pointed out that the several proposed 20-story apartments would be 3400 feet back from the river, 'in a natural valley which would keep them screened from view from the river and the Virginia shore.'
>
> "He also noted expanded highway development in the general area and that neither the Board of Education nor the National Capital Planning Commission opposed the planned community.
>
> * * *
>
> "In a second action, the Commissioners unanimously approved changes in zoning requested by the Tantallon developers for two sites in the C-2 classifica-

---

**2.** In this appeal, the United States has filed a brief as amicus curiae, asking that the order of the court below be reversed.

tion, for which the developers proposed to construct a small boat marina and a restaurant. The commissioners asked legal counsel if a lesser degree of commercial classification could suffice for these facilities, but it was determined that C-2 was the only appropriate designation."

It was also stated that the Chairman of the Council, who votes only in case of tie, had declared himself in sympathy with the zoning request. Commissioner Gladys Spellman, who dissented, in a separate announcement, said in part:

"The changes which have taken place in the area are not sufficient to warrant rezoning from a low density, single family category. * * *

"No need has been established for high density apartments in the middle of an area of extremely low density, other than that of remunerative return for the applicant. * * *

"No proof of error in the original zoning was presented.

"The Isle of Thye Land Company plans high-rise apartments on approximately 29 acres, and accordingly requests a change to R-H zoning. However, the use of this zone category in a low-density setting is *totally at variance* with the *purpose* of R-H zoning as set forth in the text of the classification * * *.

* * *

"We must recognize that the District Council is concerned for the County as a whole and not merely 650 acres of the county. It is certainly not reasonable to assume that because a community is well-planned and well-balanced, it may be set down at any point in the County without doing violence to the surrounding areas. Planning must extend beyond the borders of individual communities and encompass the larger areas of the County in order that communities may complement each other rather than inflict harm upon one another."

There was a hearing on the Petition for Review of the Coun-

cil's order before Judge Loveless. In his opinion affirming the order, the Judge pointed out that the Land Company had not contended there had been a mistake in the original zoning, and that the court had no alternative other than to say that no mistake had been shown. Judge Loveless referred to the 14 items relied upon by the Land Company as changes in the area since the original zoning was made and held they were sufficient evidence to justify a reclassification if the Council, in its legislative discretion, so decided. He held, further, that the issues were fairly debatable, and that the Board's action in approving the applications was not arbitrary or capricious. We disagree in respect of the Board's order granting the application to rezone the 29 acres for high-rise apartments.

We have repeatedly held that there is a strong presumption of the correctness of original zoning, and that to sustain a piecemeal change therefrom, there must be strong evidence of mistake in the original zoning or else of a substantial change in conditions. *Greenblatt v. Toney Schloss,* 235 Md. 9, 13, 200 A. 2d 70 (1964) ; *Shadynook Imp. Assn. v. Molloy,* 232 Md. 265, 269-70, 192 A. 2d 502 (1963) and cases therein cited. The Land Company contends that here comprehensive rezoning is involved, because of the extent of its entire acreage and the nature of its plans for the development of that acreage. However, as Commissioner Spellman points out in her dissent from the Council's order, it is not the proposed treatment of a particular tract within the broad territory encompassed by the original zoning plan which governs; the impingement of the proposed rezoning upon the general plan is the criterion. See *Hewitt v. Baltimore County,* 220 Md. 48, 57-60, 151 A. 2d 144 (1959). We hold that, in this case, it is proposed piece-meal rezoning which is involved and that the strong presumption of the correctness of the original comprehensive zoning prevails.

The majority of the Council, in effect, gave no reasons for its order. The alleged changes of conditions in the immediate area adduced by the Land Company to support their application to rezone the 29 acres for high-rise apartments, in our opinion, do not constitute evidence sufficient to make the facts fairly debatable. A number of these changes have taken place, or are contemplated, within the Tantallon tract itself. The building of

a golf course, the dredging of Swan Creek, the reservation of a school site within the tract, and the authorization of public utility services for the Tantallon enterprise are as consistent with increased rural residential development as they are with the building of high-rise apartments. The characterization by the appellants of these alleged changes as "bootstrap" arguments, in our opinion, is appropriate. The report of the technical staff of the Planning Commission states that the development which has occurred within the area, including the Tantallon tract, has been a continuation and solidification of the single family dwelling pattern, with lots larger than the minimum standard, and this statement was not contradicted. The road improvements referred to by the Land Company do not change the character of the neighborhood; as the technical staff pointed out, "[t]he character of the surrounding area is reflected in the road network which consists of generally narrow, winding two-lane pavements designed to serve traffic volumes generated by low density, large lot development." The completion of the Woodrow Wilson Bridge and Anacostia Freeway listed as additional changes presumably were envisaged in the comprehensive zoning plan, adopted by the legislative body only a little less than five years before the Land Company's application. In any event, the Bridge and Freeway are some miles away.

The Planning Board, as well as its technical staff, recommended that the applications for the high-rise apartment rezoning be denied. The majority of the Council refused to accept the Board's recommendations, without substantial evidence to support its actions. In similar circumstances, although on varying facts, we have held that an order of the lower court affirming the Board's action must be reversed. *Greenblatt v. Toney Schloss, supra; Levitt & Sons v. Board,* 233 Md. 186, 195 A. 2d 723 (1963). See also *Shadynook Imp. Assn. v. Molloy, supra.* Because there was no evidence to make the issue fairly debatable, the same result must follow here.

The Land Company does not contend that denial of the application would preclude the use of its property for any purpose to which it is reasonably adapted. On the contrary, it admitted it would be practical, although from its point of view not as satisfactory, to continue the development of Tantallon without

high-rise apartments. The developer's desire to make additional profits is a legitimate motive, but not sufficient to justify a rezoning. *Shadynook Imp. Assn. v. Molloy, supra,* at 272 and cases therein cited.

In *Board v. Oak Hill Farms,* 232 Md. 274, 192 A. 2d 761 (1963) relied upon by the appellees, the situation was the converse of that here presented. There, the Planning Commission rejected the recommendation of its technical staff that the application for rezoning be denied; we affirmed the order of the lower court reversing the Councils' action denying the petition because we found (as we find here) that there was no evidence to support the Council's order.

The situation as to the two smaller tracts, for each of which application was made for commercial rezoning, in our opinion, is different. While the planning staff recommended denial of these applications as well as of the request for the R-10 zoning, the Planning Board disagreed with the recommendations as to the two smaller tracts. We agree with the court below that the issues as to these requests were fairly debatable. A zoning authority, when there is evidence to justify its finding, may determine that the creation of a small retail district within a residential area is for the accommodation and convenience of the residents, and so in the public interest. See *Hewitt v. Baltimore County, supra,* at 60. There was some evidence as to the need for more maritime amenities, and as the Planning Board pointed out, the proposed marina and restaurant would be consistent with the low-density pattern of development. The Council's action as to these applications was properly sustained.

> *Order reversed in part and affirmed in part and case remanded for further proceedings in accordance with this opinion; the costs to be paid by the appellees.*

BARNES, J., filed the following dissenting opinion.

It is with trepidation that I write my first dissenting opinion as I have always believed that, wherever possible, appellate courts should have unanimous opinions. My Brethren assure

me, however, that often dissenting opinions may be helpful to point up and clarify the issues involved and it is with this encouragement that I proceed.

In my opinion, the majority has not only gone astray in its application of the law of zoning to the facts of the case, but has applied principles and standards that I believe are inapposite to the factual situation present in this appeal. In either event the time has come when the soundness of the foundations upon which those principles and standards rest should be re-examined.

The order of the Circuit Court for Prince George's County involved in this appeal has been reversed in part and affirmed in part. I will deal initially with that part of the order which the Court reverses—first in the light of the principles and standards which the Court has applied (Part I), then with the prior cases indicating to my mind that the principles and standards applied by the Court are not applicable in this factual situation (Part II) and then with a suggested re-examination of those principles and standards (Part III). Finally, this dissenting opinion will consider my reservations in regard to those parts of the order of the lower court which are being affirmed (Part IV).

## Part I

Of the three petitions presented by the Isle of Thye Land Company to the District Council of the Maryland-Washington Regional District in Prince George's County, the petition seeking reclassification of a 29.15-acre tract from an R-R (rural residential) zone to an R-H (high-rise apartment) zone will be discussed in this Part of this opinion. That petition was referred to the Technical Staff of the Maryland-National Capital Park and Planning Commission, as required by Subtitle 59-83 of the Code of Public Local Laws of Prince George's County (1963 edition), and was the subject of unfavorable recommendations by the Staff and by the Planning Commission itself. Despite such recommendations, the County Commissioners, sitting in their capacity as a special statutory District Council, granted the Company's petition and rezoned this tract to the requested high-rise apartment classification by vote of four to

one. The Circuit Court affirmed this action, but a majority of this Court today reverses the order of the lower court.

In his written opinion in the lower court, Judge Loveless commended both sides for having presented strong, solid testimony; noted that "both proponents and opponents presented meritorious arguments," and that "a decision would be most difficult to make." He concluded that the legislative body did not act from caprice, that the entire record presented a fairly debatable issue, and that "a reasoning mind could reasonably have reached the decision of the District Council."

In view of these definite findings by the learned court below, what does the majority opinion offer to sustain its determination that all of the proponents' evidence, even if believed, is insufficient as a matter of law, to justify a reclassification, if the District Council in its legislative discretion should resolve to make such a change? The first several pages of that opinion deal with the evidence with respect to the needs for, and desirability of, the proposed rezoning, as seen through the eyes of the Technical Staff, the Planning Commission, the several Councilmen, and the Circuit Court. The majority opinion offers no hint in regard to its views of this evidence; it then proceeds to deal with and to apply rigidly, the "change or mistake" rule.

The Court next turns to the subject of a "change in conditions" and notes that fourteen (14)[1] such changes were relied upon by the applicants for rezoning before the District Council and before the Circuit Court, which sustained the Council. But, we are told, some changes occurred within the geographical boundaries of the Company's property itself, while other changes are consonant with "the single family dwelling pattern," and still others, such as the construction of new freeways and bridges nearby, "presumably were envisaged in the comprehensive zoning plan." First of all, it seems to me that this treatment of the

---

1. There were thirteen (13) changes listed on Exhibit 6 as the first item was merely the date, June 1, 1957, when the area was added to the Regional District by the Maryland-National Capital Park and Planning Commission.

evidence supporting the change in conditions is not sufficient in this type of case. Whether the test be the presence of changes (in the plural) of conditions (*Offutt v. Board of Zoning Appeals*, 204 Md. 551, 557, 105 A. 2d 219 (1954)) or of *a change* in the character of the neighborhood (*Serio v. Mayor and City Council*, 208 Md. 545, 551, 119 A. 2d 387 (1955)), any one of the alleged changes, since we are not told upon which one or ones the Circuit Court made its decision, may in and of itself have been thought to justify the decision of the District Council. In deference to its decision, then, each and every such change should have been declared insufficient as a matter of law, before Judge Loveless' order could properly be reversed. After reciting as Item 1 that the area was added to the Regional District by the Maryland-National Capital Park and Planning Commission (MNCPPC) on June 1, 1957, the following changes are listed on Petitioner's Exhibit 6 filed September 17, 1963, as follows:

1. First parcel of Tantallon was acquired July 22, 1959; the first master plan of Tantallon was completed in August 1960 by Theodore G. Robinson;[2] and the present master plan for Tantallon was completed in October 1961 by Mr. Robinson.

2. The District Council for Prince George's County granted a special exception for a golf course and Country Club on October 20, 1961; this is shown in the shaded dark green area on the October 1961 final master plan for Tantallon.

3. The championship golf course was completed on August 21, 1962.

4. The Woodrow Wilson Bridge was completed and the

---

2. Mr. Robinson has extraordinary qualifications as a Planner. He holds a Master of Science degree from the University of Southern California, with a major in City Planning in 1947 and served as a City Planner from 1947 to 1950. He has been Director of Planning for the City of Pomona, California and he and his associates have acted as planning consultants to 26 cities and 4 counties in California. They have prepared many zoning ordinances and master plans. The evidence indicates that he is an advanced thinker in planning problems. This advanced thinking is reflected in his final master plan for Tantallon of October 1961 which is in the Record but which was not reproduced in the Record Extract.

Anacostia Freeway to South Capitol Street was opened on December 28, 1961.

5. Five subdivision plats were approved or recorded in conformity with the final master plan for Tantallon as follows:

   a. Section 1—Recorded January 8, 1963

   b. Section 2—Recorded January 8, 1963

   c. Section 3—Preliminary Plan approved by MNCPPC on March 21, 1962

   d. Section 4—Recorded November 27, 1962

   e. Section 5—Recorded February 19, 1963

6. MNCPPC required a dedication of a 60 foot right-of-way for Swan Creek Road on January 8, 1963.

7. MNCPPC required a dedication of an 80 foot right-of-way for the Fort Washington Road on November 27, 1962.

8. The U. S. Corps of Engineers issued a permit on March 29, 1962 to dredge Swan Creek and the first section from the main channel of the Potomac River to the Swan Creek Bridge was dredged to 6.5 feet at MLT.

9. The Piscataway Regional sewerage system was approved by the Washington Suburban Sanitary Commission (WSSC) on August 16, 1960; WSSC authorized waste and sewer service to Tantallon on November 8, 1962; the Piscataway treatment plant site was selected on April 4, 1963.

10. The Indianhead Highway was scheduled for dualization in the 3rd quarter of 1963 by the State Roads Commission of Maryland.

11. The Washington Gas Light Company authorized gas service to Tantallon on December 26, 1962.

12. The National Capital Planning Commission at its September 1962 meeting approved the proposal of its Staff for a reduction of taking for park purposes between Fort Washington and Swan Creek from a contemplated 21 acres to approximately 10 acres in consideration of the reservation as park land of approximately 12 acres between Swan Creek and Swan Creek Road.

13. On July 3, 1962, the Board of Education of Prince George's County authorized the acceptance of the Isle of Thye Land Company's proposal to reserve a 10-acre school site on its property on the east side of Fort Washington Road.

In addition to the physical changes listed above, the substantial weight of the testimony before the District Council established that:

    a. There was a need for high-rise apartments in the area and the inclusion of the five proposed high-rise apartments were a proper part of the final master plan for Tantallon.

    b. The high-rise apartments were 3400 feet from the Potomac River and would in no way impair the view of the north shore of the Potomac River.

    c. There was no injury to the public health, safety, security or general welfare which could result from the erection of the proposed high-rise apartments.

In my opinion, the physical changes alone would support a finding by the District Council and by the lower court that there had been a "change of conditions" within the meaning of the Maryland Rule, if applicable. The physical changes are substantial ones relating to the public roads which form the southern, eastern and part of the northern boundaries of the Tantallon development, the increased accommodation of traffic from the District of Columbia to the area, the rearrangement of areas for parks, the providing of utilities for the area and the provision for school facilities by the Board of Education. Swan Creek, with the approval of the proper governmental officers, has been dredged as contemplated by the master plan of Tantallon. The subdivision plats are based on the master plan of Tantallon which includes the five high-rise apartments. This master plan is known to, and there is no objection to it from, the National Capital Planning Commission. If these physical changes in the neighborhood are not sufficient to justify the District Council in believing that there had been a "change in conditions," it is difficult for me to visualize a case in which the change of conditions rule could apply.

Secondly, I cannot see the propriety of holding that certain genuine changes in conditions, otherwise able to be considered, should be thought ineffective or insufficient solely because they occurred within the geographical limits of the 650 acres the Isle of Thye Land Company happens to own. A change is a change, regardless of the ownership of the land on which it oc-

curs. The golf course, for example, was able to be constructed only because the District Council had issued a special exception (not here challenged) some time in the past. If this be otherwise admissible evidence of a change in the environs, what does it matter that legal title to the land under the golf course is also held by the Tantallon developers?

Thirdly, the majority's statement that the population boom, together with the new highways and bridges some miles away "presumably were envisaged in the comprehensive plan," does not seem justified to me. There is no evidence that they were so envisaged and the probabilities are strong that they were not. The situation in Prince George's County is too volatile to attribute such prophetic powers to those who prepared the "comprehensive" plan. It should be kept in mind that the Tantallon area was virgin territory and, with most of such territory in this area, was all put in the R-R area in order to cover this area with this general type of zoning restriction. The plan was "comprehensive" only in that it covered all areas in the County. There have been no detailed plans in this area promulgated by the County; the only detailed plan is the October 1961 development plan of Tantallon prepared by Mr. Robinson. Then too, what physical changes occurring after the promulgation of the "comprehensive" plan in 1957 by the County might not be said to have been "presumably envisaged" in that plan and thus be made to disappear, as it were, from consideration as subsequent changes? There is far too much room here for the operation of subjective considerations.

Something was made of the disapproval of the R-H applications by the Technical Staff and by the Planning Commission. The Staff's report, indeed, goes so far as to say that "The staff in its review of these applications, concludes that the granting of any zone on these properties other than the existing R-R zone, would be spot zoning." (It should be kept in mind that "spot zoning" is a neutral term, neither positive nor negative in connotation, a descriptive word, and not a word of art; *Hewitt v. Baltimore County,* 220 Md. 48, at 57, 151 A. 2d 144, 149 (1959)). The representative of the Planning Commission, Warren Giauque, appeared before the District Council as a neutral witness. While explaining and, at first, echoing the Staff's com-

ment about piecemeal rezoning, a reading of later portions of his testimony reveals that he amended these sentiments significantly. The following examination by counsel appears to me to be pertinent:

"Q. Now, can you establish zoning by design, Mr. Giauque?

A. Not really; no.

Q. But is it possible?

A. Well, it probably is if you are dealing with a large tract of ground, when you are talking about a design of a large tract of ground for development.

Q. This is true. That is right. Exactly. And cannot this be done?

A. Oh, sure.

Q. Why could not this be considered a development by design?

A. Well, what you are suggesting is that the application for the R-H zone has merit in the fact that it is a part of a larger tract of ground.

Q. Of the entire planned, well-balanced development, as we consider it.

A. In that respect it would be.

Q. All right."

Commissioner Gladys Spellman, the single Councilman who failed to concur in the granting of the R-H rezoning request, based her dissent largely on the basis of the presumed effect of the proposed apartments on the Potomac shoreline and skyline, and the deleterious effect upon the view from Mount Vernon and Fort Washington. Secretary of the Interior Udall also expressed these sentiments in a letter to the Council which prophesied that the apartments might become "dominant." The appellant MacDonald, a historian by profession, voiced his fear that the apartments would be "shockingly visible." But opposed to these opinions was an overwhelming mass of evidence to the effect that Secretary Udall's fears had little chance of materializing. It was testified that the proposed luxury apartments would be some 3400 feet back from the Potomac, on the south side of Swan Creek, approximately in the center of the 650-acre parcel

of land. Indeed Councilman Sutphin stated he would have opposed R-H rezoning had they not been. The apartments would be screened from view by trees, already in place, 60 feet in height, surrounded by a high ridge on the south, southwest, and southeast. The clincher to this argument, I believe, is the example given by Mr. Robinson, the expert planner of Tantallon :

> "First, as has been pointed out previously, this property is not on the Potomac River, it is a minimum of 3400 feet from the edge of the property. It is located within an area, as I say completely surrounded by high ridges and existing trees, and it is built or proposed to be built on land that has an elevation, maximum elevation, of 40 feet.
>
> "Now, let me give you an example. You may or may not be familiar with the water tower in Fort Washington, or on Fort Washington, I should say. Now, this water tower is located on land approximately one hundred eighty feet (180) high ; your tower itself is 90 feet high, which makes it approximately between 280 and 290 feet in height. Assuming for the moment that they were to build, say, a 15-story apartment on there that would give a height of about 140 feet. In considering the elevation of the land that would give a total height of 180 feet. *The top of that water tower is over 100 feet higher than these apartments, and it is barely visible at the present time.* In consideration of the fact that it is at that low altitude, I can see no detrimental effect whatsoever." (Emphasis supplied).

Even more conclusive evidence that the fears of Secretary Udall and Professor MacDonald are fanciful is the 1956 Geological Survey Map of the United States Department of the Interior bearing the legend "Mount Vernon, Md.-Va., NE/4 Indian Head 15' Quadrangle, N 3837.5—W 7700/7.5." This map, which is in the record, shows that while Fort Washington, about which Mr. Robinson testified, *is directly visible* from Mount Vernon, across the Potomac River, Tantallon is not di-

rectly visible from Mount Vernon. This is because the peninsula formed by Hunting Creek and the Potomac River projects in a southerly direction into the Potomac River to interrupt the view from Mount Vernon to Tantallon. A person at Washington's Home would see Stratford on the Potomac, Potomac Valley and the Fort Hunt National Park on the jutting peninsula before he could ever see Swan Creek and Tantallon. One only need place a ruler on the map to verify this.

I deem it unnecessary further to prolong this Part of the opinion. See *Hendlin v. Fairmount Construction Company*, 8 N. J. Super. 310, 72 A. 2d 541 for a discussion of rezoning when dealing with a self-integrated tract. There was, in my view, a substantial body of evidence under the Court's own established tests, upon which to permit a rezoning to the R-H use district. If the factors of need, of desirability, of good planning, and of beneficial effect upon the entire community—be considered, the case for the proponents of rezoning becomes well-nigh irresistible. This will be later considered under Part III.

## Part II

It seems clear to me, that under our prior decisions the "mistake-change in conditions" rule is not applicable at all to the factual situation presented in this case. The R-H zone involved in the case at bar is a residential zone compatible with existing residential zones. It has some of the qualities of the so-called "floating zone." Professor Reno of the University of Maryland School of Law describes the "floating zone" as an example of "Non-Euclidean" zoning, in his interesting and instructive article in 23 Md. Law Review, 105 entitled, *"Non-Euclidean Zoning: The Use of the Floating Zone."* He points out that the floating zone, which is implemented by legislative action in the nature of a special exception, is a new concept in zoning and frees the legislative body from the shackles of the conventional "Euclidean zone" fixed as to definite areas. The validity of this type of "zone" has been the subject of litigation with differing results. In Pennsylvania, for example, the Supreme Court of Pennsylvania, held that this type of zone was not within the purview of the State Zoning Enabling Act. See *Eves v. Zoning Board of Adjustment of Lower Gwynedd Township*, 401 Pa.

211, 164 A. 2d 7 (1960). On the other hand, the Court of Appeals of New York sustained a floating zone permitting garden type of apartments, with adequate provisions for set backs, spacing of buildings and for a minimum 10.5 acre lot, upon application of an individual property owner and the approval of the Board. See *Rodgers v. Village of Tarrytown,* 302 N. Y. 115, 96 N. E. 2d 731 (1951). We have approved the New York rule and followed and applied the *Rodgers* case in *Huff v. Board of Zoning Appeals of Baltimore County,* 214 Md. 48, 133 A. 2d 83 (1957). In *Huff* it appeared that Baltimore County was rezoned with 12 fixed use districts—6 residential, 3 commercial and 3 industrial with 1 floating industrial use district "M-R"—Manufacturing Restricted—which provided for a minimum size lot of 5 acres, for lot coverage of not in excess of 25%, and to be restricted to light industrial uses which would not produce noise and odors and which would not be disturbing to adjacent residences. Permission to establish such a zone was granted (or refused) upon a petition filed by an individual property owner, with appropriate notice, etc. A property owner, owning 18 acres of land in a Residential Use District (R-6 for one and two family homes), applied for the rezoning of his land to M-R to erect a factory to manufacture electrical precision instruments for use in missiles. The application was approved by the Zoning Commissioner, the Planning Commission, the Board of Zoning Appeals and, on appeal, by the Circuit Court for Baltimore County. We affirmed, Judge Henderson dissenting. On the subject of spot zoning (the ground on which the Planning Commission in the case at bar disapproved the application), Judge Hammond, for the majority of the Court said:

"When a zoning ordinance or an amendment puts a small area in a zone different from that of the surrounding area, we have what may be called 'spot zoning', using the term in a descriptive sense. Such zoning may be invalid or valid. If it is an arbitrary and unreasonable devotion of the small area to a use inconsistent with the uses to which the rest of the district is restricted and made for the sole benefit of the private interests of the owner, it is invalid. *Cassel v. City*

*of Baltimore,* 195 Md. 348, 355. On the other hand, if the zoning of the small parcel is in accord and in harmony with the comprehensive zoning plan and is done for the public good—that is, to serve one or more of the purposes of the enabling statute, and so bears a substantial relationship to the public health, safety, morals and general welfare, it is valid. *Offutt v. Board of Zoning Appeals,* 204 Md. 551, 561; *Temmink v. Board of Zoning Appeals,* 205 Md. 489, 495; *Ellicott v. City of Baltimore,* 180 Md. 176, 183; *Cassel v. City of Baltimore, supra."* (p. 57 of 214 Md., p. 88 of 133 A. 2d).

In regard to whether the floating zone was compatible with the idea of a comprehensive zoning ordinance, Judge Hammond stated:

"A zoning plan does not cease to be a comprehensive plan because it looks to reasonably foreseeable potential uses of land which cannot be precisely determined when the zoning is passed. In zoning of undeveloped areas, account can be taken of potential uses reasonably foreseeable, that is, as the Planning Commission put it, the undeveloped areas can be looked upon as a reservoir of future land uses." (p. 60 of 214 Md., p. 90 of 113 A. 2d).

We followed *Huff* and treated it as controlling in *Costello v. Sieling,* 223 Md. 24, 161 A. 2d 824 (1960) by a unanimous court. In my opinion, the *Costello* case cannot be distinguished from, and is controlling in, the case at bar. In *Costello* three zones called "Tourist Accommodation Districts" had been created. The T-1 district, among other uses, permitted "motels and tourist cabins and hotels." The T-2 district, among other uses, permitted a "trailer coach park." In the T-2 district a minimum lot area of 3 acres was required, a 50 foot set back for any trailer from a street or road, a 20 foot set back from any side line, and a 25 foot set back from a rear line. The lot coverage could not be more than 50% by trailer coaches or buildings. In 1959, the County Commissioners for Howard

County upon the application of the contract purchaser of a 92-acre tract of land, zoned "R" (Residential) reclassified that tract to T-2. The tract in question was surrounded by properties devoted to residential and agricultural uses. The protestants owned an 878 acre farm, the principal improvements on which were located ½ mile from the southern end of the rezoned tract. In the proposal the applicants indicated that they would provide and maintain a water system, swimming pool, an auditorium and an administration building, with a fountain and a loggia for adornment. There was testimony that existing trailer parks were inadequate to meet the needs of the community but this was contradicted by the owners of two large trailer park areas. The expert testimony indicated, with one exception, that the establishment of the trailer park would not adversely affect surrounding properties. The Planning Commission of Howard County *recommended denial* of the application on the grounds that there would be an undue concentration of occupants in a small area, it would create a greater demand for community facilities—than would be required for the normal half-acre residential development, there would be major sewerage and water supply problems and the original zoning was much more desirable on the tract. The County Commissioners *approved* the reclassification, noting that the use was closely related to residential use, there was a need for the new trailer park, the surrounding properties, save one, would not be adversely affected and there would be no undue demand for county facilities. The Circuit Court, on appeal *reversed* on the grounds 1) that the T-2 classification was not analogous to a special exception as in *Huff* and 2) there was no substantial evidence before the County Commissioners that there was either a mistake in the original zoning or of a substantial change in the character of the neighborhood. We reversed, holding that *Huff* controlled and that the "mistake-change in conditions" rule was not applicable.

Judge Horney, for the Court, stated:

"As to the principal questions, we think the principles enunciated by Judge Hammond for this Court in *Huff v. Board of Zoning Appeals*, 214 Md. 48, 133 A. 2d 83 (1957), are controlling here in that the grant-

ing of the trailer park classification was somewhat analogous to a special exception when applied to a former residential zone. Moreover, since the trailer park is also residential in character, it appears that the reclassification is neither incompatible nor inconsistent with the remainder of the areas in the residential district. In these circumstances, the questions of mistake and change are not controlling." (p. 29 of 223 Md., p. 826 of 161 A. 2d).

In regard to locating the trailer park in the residential zones, Judge Horney stated:

"As to the propriety of locating T-2 areas in residential zones, it is apparent, since there was no unzoned land in the county, that the T-1 and T-2 zones must be carved out of some land use district or districts originally zoned for other purposes. Under these circumstances, there is no doubt that if the area selected serves a public rather than a strictly private purpose, so as to exclude it from the category of illegal 'spot zoning,' and is also such that it is fairly debatable whether it is appropriate as a place for the new use, so that the placement cannot be deemed to be arbitrary or capricious, then the rezoning should be upheld. Moreover, since the amended zoning regulations did not limit the location of a T-2 zone—or a T-1 zone either for that matter—to areas formerly zoned residential, the same rules as to debatability and legislative whimsicalness are likewise applicable to the placement of trailer parks in other zones. Indeed it appears that six out of seven areas zoned T-2 since the creation of the tourist accommodation classifications have been in M-1 and M-2 zones as was formerly required, but the presumption is that such placements met the required tests.

"We are not persuaded by the argument of the protestant that the differences between the other classifications, especially the residential ones, and the newly created tourist accommodation zones, were so slight

that the distinctions were meaningless. Keeping in mind the fact that the tourist accommodation zones under attack do no more than substitute an unconventional type of housing for the conventional types usually found in a given community, we think it is clear that only slight distinctions or gradations—if indeed any were needed other than the specially required planning of the design, layout and roads—in the specified standards were necessary in order to establish a tourist accommodation use within the confines of any other zone." (p. 32 of 223 Md., p. 827-828 of 161 A. 2d).

The R-H zone was adopted by the Board of County Commissioners for Prince George's County on November 30, 1962. As in *Costello,* the R-H zones must necessarily be carved out of districts zoned for other purposes. The purpose of the R-H zone and the substantial restrictions applicable to it, indicate that the newly created R-H zone is compatible with existing residential zones. It is recited in the purposes of the R-H zone that:

"It is further the purpose to provide on these sites a maximum of open space for the benefit of the residents of the development together with a minimum of obstruction to the view of those who live in the surrounding area."

The uses permitted as of right include agricultural uses, a business office in a multiple-family or multiple group dwelling, churches, convents, monasteries and other places of worship, dwellings-one-family detached, dwellings-multiple family, libraries, museums, and similar institutions of a non-commercial nature, off-street parking of private automobiles in connection with any permitted use, and publicly owned buildings, including community buildings, public parks, playgrounds and other recreational uses. By a special exception, apartment hotels, community swimming pools for the sole use of apartment tenants and their guests, and other consistent uses may be permitted.

The restrictions in the R-H zone are many and stringent. These must be a minimum lot size of 5 acres. Each lot must have a minimum lot width at the front building line of 250 feet. The minimum net lot area per dwelling unit is provided on a graduated scale with a low of 900 square feet for 7 multi-family dwellings or less, to 1400 square feet for more than 11 but not more than 12, but it is provided that in no case shall coverage exceed 12% nor be less than 900 square feet of net lot area for each dwelling unit.

In regard to yards, it is provided that the minimum front, side and rear yards generally are 30 feet for buildings not more than 30 feet in height with a provision for the increase by one foot for each foot the height of the building exceeds 30 feet. Between multiple family dwellings a distance of 50 feet is required, and this distance also increases one foot for each foot the taller building exceeds 30 feet. Off-street parking is required at a rate of $1\frac{1}{4}$ spaces per dwelling unit, with a minimum width of 9 feet and a minimum length of 20 feet. Not less than 55% of the net lot area used for a multiple family or multiple group dwelling must be devoted to green area, as defined in the ordinance, and these green areas must be maintained in good condition. There are restrictions on lighting to protect "adjoining residential property."

An applicant for a building permit or a certificate of occupancy in the R-H zone is required to submit a "plan of development" to the Department of Licenses and Permits which in turn is required to submit the site plan to the Planning Board for its consideration. The plan of development, in addition to the usual data, is required to show "the location and height of all buildings and structures, the area devoted to parking facilities and accessory buildings, all access roads and drives, the topography and major vegetation features now existing on the land, the proposed grading, landscaping and screening plans, recreation, outdoor living, and other green areas, and such other features as the applicant considers to be of importance in the evaluation of the development plan." It is required that all construction and development under any building permit shall be in accordance with the approved development plan.

It seems clear from these provisions, that the R-H zone is

even more compatible with existing residential use districts than were the T-1 and T-2 trailer park zones in *Costello*. It might be added that if the "floating" M-R zone in Baltimore County—which was an industrial zone—is sustained as valid, without regard to the "change-mistake" rule, *a fortiori,* the R-H zone in the case at bar must be sustained.

It is quite apparent to me that the facts in the case at bar bring it well within the decision in *Costello* and the "mistake-change in conditions" rule has no application. The lower court did consider the "mistake-change in conditions" rule, but was of the opinion that there were sufficient facts to indicate a change of conditions. He also found that the action of the Board was supported by substantial and competent evidence and was not arbitrary, unreasonable or capricious. His finding on the "mistake-change in conditions" issue was, in my opinion correct, but of no importance in view of the holding in *Costello* and his finding was clearly correct on the second issue, there being ample evidence to support the action of the Board. Indeed there is far more evidence to support the Board in this case than there was in either *Costello* or *Huff*. The use in this case was residential and, as indicated, was far more consistent with the existing residential use than was the trailer park in *Costello* and most certainly more compatible than the light manufacturing use in *Huff*.

In the case at bar the uncontradicted evidence established that the *density* in the R-H zone after the erection of the high-rise apartment would be 1900 families as compared with 2000 families under the existing R-R zoning. In other words, there would be a *decrease* in density as a result of the Board's action. The evidence showed that the luxury type of apartments would appeal to high income groups who would be retired or other persons no longer desirous of caring for and maintaining a separate home on a separate lot and raising a family. It seems clear that not only are the number of families less in the high-rise apartments but the *number of persons* will undoubtedly be considerably less than would be the case if the land were developed under the existing R-R zoning.

Then too, the evidence established that the Tantallon tract of 655 acres was planned as a whole. The lots in some sections

range from $6000 to $7500; other lots average $9100. The price of homes runs from $32,500 up to $100,000. The income from the high-rise luxury apartments was expected to help maintain the quality of the development. While it can continue without this income, the quality will be reduced. The developers spent $1,550,000 on the plan before beginning the first house, and the developers have evidenced an enlightened attitude toward their public responsibilities and the community welfare. The quality of the development is established and will be maintained by comprehensive covenants.

The concept of a large residential development appealing to *all* economic classes in the community in which the amenities of comfortable living are enjoyed by all is a new and imaginative concept in planning. The legislative body of Prince George's County created the R-H zone to assist in promoting this new concept; it has reasonably and properly applied its legislative power in approving this application and, in my judgment, its action should be sustained.

It may be added that neither *Huff* nor *Costello* have been overruled or modified by our subsequent opinions. Both cases have been distinguished from the situation arising in Baltimore County in regard to action by the County Board of Appeals in reclassifying land from R-6 (residential, one or two family) to R-A (residential, apartment). See *Shadynook Improvement Association v. Molloy,* 232 Md. 265, 192 A. 2d 502 (1963), *Levy v. Seven Slade, Inc.,* 234 Md. 145, 198 A. 2d 267 (1964), and *Rohde v. County Board,* 234 Md. 259, 199 A. 2d 216 (1964). Chief Judge Brune for the Court in *Rohde, supra,* pointed out the distinction as follows:

> "The appellants also charge that the rezoning is bad as spot zoning and that there was no sufficient evidence of mistake in original zoning or of change in conditions as to warrant reclassification. They also lay stress on the fact, which is conceded, that the property can be used under its R-6 classification. That alone is not, however, an absolute bar to reclassification. Zoning is not static. *Missouri Realty, Inc v. Ramer, supra,* 216 Md. at 447. It is, nevertheless, necessary

to show error in original zoning or in its equivalent, comprehensive rezoning, or a subsequent change in conditions, although the change in classification be from one residential use to another (*Reese v. Mandel,* 224 Md. 121, 167 A. 2d 111; *Levy v. Seven Slade, Inc.,* 234 Md. 145, 198 A. 2d 267), unless the Legislature has indicated that the new classification and the classification of neighboring property are compatible. See *Huff v. Board of Zoning Appeals,* 214 Md. 48, 57, 133 A. 2d 83, where such a new classification was analogized to a special exception, and *Costello v. Sieling,* 223 Md. 24, 161 A. 2d 824, where a new classification of a residential nature was superimposed upon existing residential classifications and *Huff* was followed; and see the comment on these cases in *Overton v. Board of County Comm'rs of Prince George's County,* 223 Md. 141, 150, 162 A. 2d 457." (pp. 266 and 267 of 234 Md., p. 220 of 199 A. 2d). This distinction is also suggested by Professor Reno at pages 118-119 of 23 Md. Law Review.

*Overton v. Board of County Commissioners of Prince George's County,* 223 Md. 141, 162 A. 2d 457 (1960) involved a change from R-R to C-O (Commercial-office building) and did not involve the R-H zone involved in this case, or a zone similar to it. *Levitt v. Board of County Commissioners,* 233 Md. 186, 195 A. 2d 723 (1963) involved a change from R-R to C-I and likewise did not involve the R-H zone or a similar type zone. Also in the Baltimore County cases the R-A zone is not a floating zone like M-R and hence the holding in *Huff* was held to be inapplicable. In the case at bar, however, the local legislature has indicated that the new classification and the classification of neighboring property are compatible, and hence the holding in *Costello* does apply and should control the decision in the case at bar on the petition seeking a reclassification of the 29.15-acre tract from the R-R zone to the R-H zone. I would affirm the order of the lower court sustaining the District Council's approval of the petition, subject to my comments in Part IV, *infra*.

## Part III

The majority states, in effect, that rezoning can only be sustained when there is "strong evidence of mistake" in the original zoning or where there is "a substantial change in conditions" in the neighborhood. This "mistake-change in conditions" rule came into the Maryland law by way of *dicta* of our predecessors and in a rather oblique way. The "change in conditions" concept seems to be first stated, without any supporting authority, in *Northwest Merchants Terminal v. O'Rourke*, 191 Md. 171, 60 A. 2d 743 (1948). It was repeated in a restricted form in *Cassel v. Baltimore*, 195 Md. 348, 358, 73 A. 2d 486, 488 (1950). This *dictum* was then expanded by additional *dicta* in *Kracke v. Weinberg*, 197 Md. 339, 79 A. 2d 387, 391 (1951) which added "mistake in original zoning" to a "change in the character of the neighborhood"—and so the Maryland Rule of "mistake-change in conditions" was born. It was entirely judicially conceived and delivered. It had no legislative assistance. It has had a rapid [3] and, to my mind, unhealthy growth in the

---

3. There have been at least 50 decisions of the Court involving this rule during the 12 year period 1953 to 1965. See Wakefield v. Kraft, 202 Md. 136, 96 A. 2d 27 (1953); Zang & Sons v. Taylor, 203 Md. 526, 102 A. 2d 723 (1954); American Oil Co. v. Miller, 204 Md. 32, 102 A. 2d 727 (1954); Baltimore v. Cohn, 204 Md. 523, 105 A. 2d 482 (1954); Offutt v. Board of Zoning Appeals of Baltimore County, 204 Md. 551, 105 A. 2d 219 (1954); Temmink v. Board of Zoning Appeals for Baltimore County, 205 Md. 489, 109 A. 2d 85 (1954); Zinn v. Board of Zoning Appeals of Baltimore County, 207 Md. 355, 114 A. 2d 614 (1955); Schiff v. Board of Zoning Appeals of Baltimore County, 207 Md. 365, 114 A. 2d 644 (1955); Serio v. Baltimore, 208 Md. 545, 119 A. 2d 387 (1956); Hedin v. County Commissioners of Prince George's County, 209 Md. 224, 120 A. 2d 663 (1956); Kroen v. Board of Zoning Appeals of Baltimore County, 209 Md. 432, 121 A. 2d 181 (1956); Eckes v. Board of Zoning Appeals of Baltimore County, 209 Md. 432, 121 A. 2d 249 (1956); Hardesty v. Board of Zoning Appeals of Baltimore County, 211 Md. 172, 126 A. 2d 621 (1956); Temmink v. Board of Zoning Appeals of Baltimore County, 212 Md. 6, 128 A. 2d 256 (1957); Mettee v. County Commissioners of Howard County, 212 Md. 357, 129 A. 2d 136 (1957); Nelson v. County Commissioners for Montgomery County, 214 Md. 587, 136 A. 2d 373 (1957); Board of Zoning Appeals of Baltimore County v. Bailey, 216 Md. 536, 141 A. 2d 502 (1958); Muhly v. County Commissioners

Maryland law. The formulae have become talismanic phrases now applied with Draconian severity to the rezoning efforts of the local legislative bodies, with unfortunate results. In my opinion, the time to re-examine the entire doctrine and its premises is long overdue. As it is entirely "judge-made," a change

---

of Prince George's County, 218 Md. 543, 147 A. 2d 735 (1958); Baylis v. Baltimore, 219 Md. 164, 148 A. 2d 429 (1959); Fallon v. Baltimore, 219 Md. 110, 148 A. 2d 709 (1959); McBee v. Baltimore County, 221 Md. 312, 157 A. 2d 258 (1960); Baltimore v. N.A.A.C.P., 221 Md. 329, 157 A. 2d 433 (1960); West Ridge, Inc. v. McNamara, 222 Md. 448, 160 A. 2d 907 (1960); Overton v. Board of County Commissioners, 225 Md. 212, 170 A. 2d 172 (1961); Didlake v. Poteet, 228 Md. 588, 180 A. 2d 828 (1962); Scheydt v. Pratt Properties, Inc., 229 Md. 31, 181 A. 2d 464 (1962); Town of Somerset v. Montgomery County, 229 Md. 42, 181 A. 2d 671 (1962); DeBlasis v. Vestry of Addison Parish, 229 Md. 530, 184 A. 2d 840 (1962); England v. Rockville, 230 Md. 43, 185 A. 2d 378 (1962); George F. Becker Co. v. Jerns, 230 Md. 541, 547, 187 A. 2d 880 (1963); Anne Arundel County v. Fairwinds Beach Club, Inc., 230 Md. 569, 187 A. 2d 845 (1963); Alvey v. Michaels, 231 Md. 22, 188 A. 2d 293 (1963); Shadynook Improvement Ass'n. v. Molloy, 232 Md. 265, 192 A. 2d 502 (1963); Furnace Branch Land Co. v. Anne Arundel Co., 232 Md. 536, 194 A. 2d 640 (1963); Elliott v. Joyce, 233 Md. 76, 195 A. 2d 254 (1963); Levitt & Sons, Inc. v. Board of County Commissioners of Prince George's County, 233 Md. 186, 195 A. 2d 723 (1963); Montgomery County v. Ertter, 233 Md. 414, 197 A. 2d 135 (1964); Levy v. Seven Slade, Inc., 234 Md. 145, 198 A. 2d 267 (1964); Jacobs v. County Board of Appeals, 234 Md. 242, 198 A. 2d 900 (1964); Rohde v. County Board of Appeals of Baltimore County, 234 Md. 259, 199 A. 2d 216 (1964); Greenblatt v. Toney Schloss Properties, Inc., 235 Md. 9, 200 A. 2d 70 (1964); Lee v. County Board of Appeals, 235 Md. 38, 200 A. 2d 159 (1964); Board of County Commissioners v. Levitt & Sons, 235 Md. 151, 200 A. 2d 670 (1964); Toomey v. Gomeringer, 235 Md. 456, 201 A. 2d 842 (1964); Marcus v. Montgomery County Council, 235 Md. 535, 201 A. 2d 777 (1964); Jobar Corp. v. Rodgers Forge Community Ass'n., 236 Md. 106, 202 A. 2d 612 (1964); Kaslow v. Mayor & Council of Rockville, 236 Md. 159, 202 A. 2d 638 (1964); DePaul v. Board of County Commissioners of Prince George's County, 237 Md. 221, 205 A. 2d 805 (1965); Pahl v. County Board of Appeals of Baltimore County, 237 Md. 294, 206 A. 2d 245 (1965); Greenbelt v. Jaeger, 237 Md. 456, 458, 206 A. 2d 694, 695 (1965); Dal Maso v. Board of County Commissioners of Prince George's County, 238 Md. 333.

in, or broadening of, the doctrine would operate only prospectively and would in no way impair vested rights, inasmuch as it is not a rule of property. Under these circumstances, the doctrine of *stare decisis* is not a substantial obstacle in effecting a much-needed change. If my Brethren are reluctant to overrule or modify the "mistake-change" doctrine, I suggest with great respect, that the Legislative Council and ultimately the General Assembly give serious thought to a change by appropriate legislation.

Let us examine the syllogisms upon which this "change-or-mistake" rule rests. As I see them they are:

Major premise: The comprehensive zoning plan was a good plan when enacted; the plan is good today, if physical conditions have not changed.

Minor premise: Physical conditions have not changed.

Conclusion: The plan is good today.

The "mistake" part of the "change-or-mistake" rule is founded on another such syllogism, equally grim, which goes like this:

Major premise: Today's plan is a good plan, but differs from the original plan; if physical conditions have not changed, the original plan must have been bad.

Minor premise: Physical conditions have not changed.

Conclusion: The original plan must have been bad.

The difficulty lies in the dependence upon the terms "good" —"bad"—"conditions", and the interpretation to be placed on each. Or, to put the matter a different way, the defect may lie in confining the term "conditions" to the connotation of "physical conditions."[4] As a cursory glance at the Index to Legal Periodicals and to other compilations of journal topics will show, the ideas of planning and zoning, for the modern urban

---

4. Rathkopf attempts to reconcile the Maryland rule with the prevailing view by re-defining the terms "change" and "mistake" to give them more stretch: "The term 'changed conditions' need not relate to actual physical conditions already present; it may relate to social or economic conditions reasonably forseeable and presently or potentially operating upon the community. The term 'mistakes in the original ordinance' may refer to a failure to foresee as well as to an actual then present error of classification or boundary." (RATHKOPF, section 27-19).

complex, have come a long way since that day in 1926 when *Euclid v. Ambler Realty Company,* 272 U. S. 365, 47 S. Ct. 114, 71 L. ed 303 (1926) first upheld the idea and practical application of zoning. See Haar, *In Accordance with a Comprehensive Plan,* 68 Harv. L. Rev. 1154.

In his article referred to above, Professor Reno tells us:

"Since World War II, city planners have revised some of their major premises upon which the early zoning ordinances have been based. With the development of the urban sprawl around the large cities, the need for neighborhood shopping centers in residential areas is now recognized. Likewise, the development of garden apartments has weakened the argument that multiple dwellings are a discordant influence in a single family dwelling area. In addition, many types of light industry, involving no noise, odor or smoke, can be conducted in a residential area without infringing upon the peace or quiet of the neighborhood. With the rising tax rate in these suburban areas, the attraction of these light industries into the suburban area becomes financially desirable" (at page 106).

The "change-or-mistake" rule derived from the syllogisms above set forth is rendered erroneous by the simple truth: "Ideas change."

In my opinion, the correct rule in considering the validity of rezoning ordinances is whether or not the ordinance is unreasonable, arbitrary or capricious. We have stated this as the applicable rule. See *Muhly v. County Council for Montgomery County,* 218 Md. 543, 546, 147 A. 2d 735, 738 (1958). *Ellicott v. Baltimore,* 180 Md. 176, 184, 23 A. 2d 649 (1942).[5]

There is a strong presumption in favor of the reasonableness of a zoning ordinance, but we have indicated that this presumption of reasonableness does not apply with the same weight or "with as great force" to a rezoning ordinance. See *Mettee*

---

5. In Ellicott it was pointed out by our predecessors that the ordinance rezoning a lot of 100 feet by 125 feet at Cold Spring Lane and Greenspring Avenue in Baltimore City from a Residential to First Commercial zone so that a filling station could be erected, was not unreasonable, arbitrary or capricious as the City Council *could reasonably have thought* that the establishment of the proposed filling station filled a public need at that location.

v. *County Commissioners of Howard County,* 212 Md. 357, 366, 129 A. 2d 136 (1957) and cases cited there beginning with *N. W. Merchants Terminal v. O'Rourke, supra.* In my opinion, the presumption of reasonableness is just as strong in support of the rezoning ordinance as it was in support of the original zoning ordinance. This seems to be the general rule.

In *Bartlett v. Middletown Township,* 51 N. J. Super. 261 quoted in 1 RATHKOPF, THE LAW OF ZONING AND PLANNING, 27-14 (n. 22), the court said:

> "Plaintiffs' argument proceeds on the basis that there was a presumption running in favor of the zoning ordinance as it stood before the amendment, and this 'existing presumption' of validity had to be overcome before it could be said that there was a 'subsequent presumption' in favor of the amendatory ordinance. The short answer to this is that the presumption of validity attending the original ordinance must give way to the presumption of the correctness of the amendatory ordinance. The Legislature not only conferred upon municipalities the power to adopt zoning ordinances, but also the power to amend, change, modify, or repeal them, and to change the boundaries of districts from time to time, provided that the amendatory ordinance should first have been submitted to the planning board and been approved by it. N.J.S.A. 40: 55-35. Some of the cases we have referred to in discussing the presumption of validity that attaches to local zoning legislation, dealt specifically with amendments or supplements to original zoning ordinances [citing cases]."

Rathkopf notes that the Maryland cases sometimes emphasize the presumption of validity of rezoning and sometimes emphasize the exception, which states that the presumption of reasonableness applied "though not with as great force." After reviewing the *Hardesty* case and the *Wakefield* case (Section 21-36 to 21-38) he concludes that the Maryland cases "clearly indicate the weakness of any presumption with respect to the va-

lidity of the amendatory ordinance." Coupling this with our "change-or-mistake" rule, he concludes:

> "If such proof must appear, very little 'presumption' in favor of the rezoning would appear to remain in such states beyond the collateral rule that where the issue is debatable the courts will not substitute their judgment for that of the legislative body.
>
> "The Maryland rule would appear to be a limitation upon the power of the legislative body to rezone rather than a strict rule of presumption." (p. 27-16).

In most states, he says, the presumption of validity applies to rezoning, "without comment or disparity as to its weight" (p. 27-14). If the relation of the rezoning ordinance to the public health, safety, security, morals or general welfare is "fairly debatable" the ordinance must be sustained. See *Euclid v. Ambler Realty Company, supra* at page 388 of 272 U. S.; *Montgomery County Council v. Scrimgeour,* 211 Md. 306, 316, 127 A. 2d 528 (1956); *County Commissioners of Anne Arundel County v. Ward,* 186 Md. 330, 46 A. 2d 684 (1946).

It is also clear that if there is a mistake in the original zoning or if there has been a change in the physical conditions in the neighborhood of the area affected by the rezoning ordinance, its reasonable relationship to the police power is obviously "fairly debatable" and the ordinance must be sustained. But the "mistake-change in physical condition" rule should not be an *exclusive* test. While, of course, an amendment is often predicated upon the recognition of changing conditions or of a mistake in original zoning (see *Oka v. Cole, infra*), such factors, while relevant, are not controlling, and are among many circumstances for the Council to weigh and evaluate (see *Raymond v. Commissioner, infra*). Similarly, reviewing courts should consider the presence or absence of such factors merely as *some evidence* tending to show whether or not the action of the Council, in granting or denying a proposed reclassification, was arbitrary, unreasonable, or capricious. The majority has now made the rule the exclusive test and has confined the "change in conditions" portion of the rule to a change in *physical* conditions. Herein lies the error. As above indicated, ideas

change. They particularly change in considering zoning reclassifications in a volatile situation and particularly in an area of rural virgin territory in the process of change to urban or suburban development. The syllogisms of the "mistake-change in condition" rule applied by the majority give no place to these new ideas. As I see the matter, it is entirely possible that the original zoning viewed in the light of conditions existing at the time of the formulation of the original comprehensive plan might have been proper and in accordance with the then recognized zoning concepts, and, with no change in physical conditions in the meantime, a new subdivision, prepared in accordance with more modern and more enlightened zoning ideas, be proper a relatively short time later. If we broadened our perspective and raised our sights in the "change in conditions" portion of the rule to include changes in zoning concepts and philosophy and did not limit it to a change in physical conditions merely, the problem would be largely solved. The people's representatives would then be free to give effect to the new ideas and concepts; they would arise from the present Procrustean bed upon which we have placed them, with renewed vigor, to advance the public interest. The case at bar is an excellent example of the unfortunate effect of the presently restricted rule.

As I view the testimony in this case, it shows that the development of Tantallon-on-the-Potomac is needed, is desirable, and is in the public interest—or that the District Council could permissibly so find. Mr. Robinson, the expert planner in charge of the Tantallon development, whose extraordinary qualifications as a planner have already been set forth, and whose qualifications as an expert were accepted without cross-examination, made this intial statement:

> "First, let me say this has been a real opportunity to be able to work on a project like this, because not very often is it possible for a developer near a large incorporated area to assemble this much acreage that would permit planners to do what they dream about doing. This is exactly what we have been able to do here. * * *
> "Now, when we go into an area like this that is

completely virgin—it hasn't been touched—with numerous trees and interesting terrain, water, it offers many types that we don't get. * * *

"Let me point out that the project encompasses roughly 650 acres of land. Within that project we are setting forth on a permanent basis 170 acres for a golf course, which is integrated throughout the community. It isn't set aside in one portion of the area, it is integrated through the entire residential portion of the project. We, therefore, created the maximum effect of greenbelt areas on the adjoining residential areas. * * *

"Now, in addition to that fact, we have 40 acres of marina or water space; and then in addition to the proposed apartment project, we have in addition, perhaps, maybe 15 or 20 acres of open space because, naturally, you are not covering all of that land with apartment buildings. So, therefore, we have a total of approximately 230 acres of land which will never be utilized, it will never be disturbed, it will be left in its natural state, and this 230 acres of land amounts to about one third of the entire project."

Further testimony indicated that some of this 650-acre tract will be devoted to lots averaging about $9,500 in cost each; some of it will be devoted to residences in a range from $32,000 to $100,000 each; a 29-acre tract will be set aside for luxury apartments. As Mr. Robinson testified, approximately ⅓ of the land will be devoted to a scenic greenbelt area. There will be a 10-acre site for a schoolhouse (the Board of Education has already accepted the site for this purpose)—a site incidentally which was sold to the Board of Education at approximately ⅓ to ½ of the actual cost of Isle of Thye Land Company. There will be waterways (40 acres), a marina, a country club; there will be a shopping center on the easterly side. Other aesthetic considerations have been alluded to in Part I of this opinion. When asked if there were any covenants which would guarantee the community that Isle of Thye would complete the project as planned, if the District Council granted its zoning requests,

Mr. Triska, the president replied, "This is the most comprehensive covenant ever prepared in Washington. If this won't do it, then nothing else will." The evidence showed that at least $2,000,000 have already been invested in Tantallon, "including $1,550,000 before we poured the first foundation." Present in the record is also that rare phenomenon: testimony by nearby citizens and citizens' groups *in favor of* the requested high-rise apartment zoning. Mr. Anderson, president of Broadcreek Citizens Association, told the council that "the majority of the members who are close to the project would be in favor of it." The seven standards by which this group of local residents judged any new development project and their opinion of the manner in which Tantallon comes up to these standards, will repay close reading. This witness noted that "at no time has the developer tried to hide his intentions regarding * * * the apartments" and concluded: "All I wish to say is that the Broadcreek Citizens Association is proud of the Tantallon Development and we feel it will materially improve Prince George's County." Enormous amounts of labor, as well as money, have already been sunk into the project. "Approximately 40 acres of swamp were drained, half a million cubic yards of earth moved in and the water squeezed out of the swamps, and the drainage channels created to rectify the storm drainage problem * * *" Even Mr. MacDonald, the leader of the opponents of the proposed rezoning, confessed: "I admit there are many very, very attractive aspects of that plan." Mrs. Spellman, the lone Councilman dissenting from the grant of the rezoning as requested, noted that the community was "well planned and well balanced." In summary, the evidence taken as a whole amply appears to justify the sentiments of Mr. Robinson: "As a professional planner we have an opportunity very seldom to be able to create something as tremendous as this project will be, and with the opportunities in the form of recreational facilities, greenbelt areas and well balanced community, it would undoubtedly, in my opinion, (be) one of the outstanding projects in the United States * * *"

Let us assume for the argument that every good thing said about Tantallon on the last several pages, is true. Let us go further and assume that Tantallon is a 20th-century Garden of

Eden on the shores of the Potomac. Even then, under today's decision the District Council would nonetheless have to deny the application for rezoning, because the proponents had not proved the elements essential to reclassification under the present "change-or-mistake" rule. Such a decision exalts to quasi-constitutional status the original zoning plan of any given locality, and seems to me to fly in the face of our rule that a legislative body cannot curtail freedom of choice for its successors. (In the *Donohoe* case, *infra,* we applied this doctrine to this very Subtitle of the Prince George's County Code. There it was argued that because the Legislature had originally created the Maryland-Washington Regional District by a special bi-county Act, it could not legislate further on the subject by way of a public local law. We rejected the argument on the theory that the legislature in 1943 could not provide that all future legislation dealing with the Regional District must be by bi-county acts rather than public local laws, even if it wanted to).

Furthermore, this approach seems to imply that all good ideas worth having, about zoning in the section of the Regional District lying within Prince George's County, occurred in 1957. That all wisdom does not come in a blinding flash of revealed truth, in a single moment of time, is excellently made manifest by this very case. We are talking about R-H zoning; yet, prior to 6 weeks before the hearing of this case before the District Council, there was no such category as R-H zoning in existence. A would-be apartment builder was forced to apply for R-10 zoning (as the Tantallon developers originally did here). A special way of dealing with large apartment projects was felt to be desirable; that the change was for the better will become clear from a scanning of the R-10 provisions with the R-H provisions of the law. The "change-or-mistake" approach also seems to me to ignore a marked shift in emphasis in zoning: as Judge Henderson once pointed out,[6] the aim of zoning in

---

6. See Zinn v. Board of Zoning Appeals, 207 Md. 353, 359, 114 A. 2d 614 (1955): "The initial zoning plans were probably more concerned with holding the line in established communities than with the projected development of new ones, and the regulations were comprehensive only in the sense that some space was provided for the broad categories of land use and that the entire area was in-

areas where zoning is being tried for the first time, is to *hold the line* against undesirable encroachments in established communities. The outlying hinterland areas of such governmental units were included in the master plan; but the zoning was "comprehensive" only in the sense that every square inch of territory within the political subdivision had some kind of zoning on it. The modern emphasis, on the other hand, looks toward orderly planning of virgin territories, of areas whose development may yet be years in the future. And, the "change-or-mistake" approach penalizes the conscientious developer—as this case illustrates.

Another reason for upholding the action of the legislative body here is that it is a *legislative body,* and not a mere administrative organ. Zoning and rezoning is legislative in character; it is not quasi-judicial, administrative, quasi-legislative, quasi-executive, or anything other than legislative. Rathkopf, *The Law of Zoning & Planning* (3d ed.), Section 27; Yokley, *Zoning Law & Practice* (2d ed.), Section 83, and cases collected therein; 101 C.J.S. *Zoning,* Section 1 and cases cited. In the *Levitt* case, *supra,* one finds this statement:

> "We have repeatedly held that the action of zoning or reclassification of zoning is a function that is legislative in nature. However, this does not prevent the Council from making *administrative* findings of fact, drawing administrative inferences, and arriving at administrative conclusions and decisions, when hearing an application for rezoning, and the statute clearly an-

cluded in the terms of the ordinance. See Reps, The Zoning of Undeveloped Areas, 3 Syracuse L. Rev. 292, 294." See also Russell R. Reno, Non-Euclidean Zoning: The Use of the Floating Zone, 23 Md. L. Rev. 105, 107 (1963), especially page 107 where he says: "* * * (M)ost planning commissions realize, that although they have the technical advice sufficient to select an area suitable for shopping centers, multiple dwellings and light industry, they lack the coercion needed to induce the development of such areas. For this reason the tendency of planning commissions is to wait until an actual demand for a reclassification of a specific tract has developed. This raises the issue as to whether reclassification of a single tract can be justified as within the comprehensive plan for the entire community."

ticipates such action. Cf. *County Council v. Egerton,* 217 Md. 234 1 Am. Jur. 2d, *Administrative Law,* § 92. After making its administrative findings of fact, etc., the Council is then in a position to exercise its legislative function of granting or denying the petition for reclassification."

It is not clear to me what this statement means, and while having read the case and American Jurisprudence section referred to, I can find no comfort in them. In certain counties zoning and rezoning is exclusively a function of the local legislative body. In other counties, such as Baltimore County, (Regulations sec. 500.3),[7] that function is delegated to a zoning commissioner or to a zoning board of appeals. To say, however, that the District Council here is anything other than a legislative body is to mistake the creator for the creature. In dealing with such bodies the controlling question is "whether such establishment of a * * * district bears a reasonable relation to the public health, safety, or welfare so as to justify the regulation inhering therein." *Hadley v. Harold Realty Company,* 198 A. 2d 149, rearg. den. 199 A. 2d 121 (R. I. 1964). In dealing with administrative bodies, on the other hand, the controlling questions are not only whether they have acted constitutionally (whether their actions bear a rational relationship to the ends sought to be promoted) but whether they have observed the substantive standards and procedural safeguards laid down by the legislative body when it delegated legislative power to them. It may delegate too much. See Davis, Administrative Law Text, section 2.09; cf. discussion in *Pressman v. Barnes,* 209 Md. 544, 121 A. 2d 816 (1956). The true situation, then, is not that the District Council was wearing an administrative hat here; but that administrative officers and boards in counties where they have power to reclassify (e.g., Baltimore County) are wearing a legislative hat *pro hac vice.* Therefore, even if it could be argued that an administrative official (or officials) must observe the "change or mistake" rule, because it must be subser-

---

7. "Any such reclassification when granted by the Zoning Commissioner shall, in the absence of an appeal, have the force and effect of law."

vient to the legislature's policy, the legislative body, contrariwise, should be able to adopt a "change-mistake-need and desirability" rule, simply because it is a local legislature, and its "classification as (to) the means for attaining a permissible end is not to be declared invalid if any state of facts reasonably can be conceived that would sustain it," and "due regard must be accorded to the collective judgment of those familiar with the locality and the circumstances prevailing in the town." *Raymond v. Commissioner of Public Works of Lowell,* 333 Mass. 410, 131 N. E. 2d 189 (1956).

Curiously enough, the proposition that overwhelming public needs and desires may sometimes justify a rezoning, even in the absence of a change in the character of the neighborhood or a mistake in the original zoning ordinance, has received at least tacit, limited recognition by the Court itself, in its approval of the Council's reclassification of the two smaller tracts from an R-R zone to a C-2 (heavy commercial) zone. (The C-2 zone is, of course, a much more intensive use than the R-H zone, which the Court has today struck down). The majority opinion does not pretend to find a "change" or "mistake" but nonetheless holds that "the issues as to these requests were fairly debatable." I submit that the only evidence before the District Council which might justify its decision to grant the proposed C-2 reclassification, is that relating to public need, accommodation, and convenience.

It will be remembered that the Planning Commission disagreed with the recommendation of its Technical Staff and recommended approval by the District Council of the two requests for the C-2 zone. The written report of the Commission to the Council is couched exclusively in terms of need and desirability:

> "The members of the Board disagree with the recommendation of the technical staff with respect to Zoning Applications Nos. A-4470 and A-4479. These applications request the reclassification of two tracts of land on opposite sides of Swan Creek, south of Swan Creek Road, from the R-R to the C-2 zone. The applicant has indicated that he desires this zoning for the purpose of constructing a marina and restaurant.

And the preliminary development plan for the applicant's entire tract discloses that the establishment of a marina is an essential element in this plan.

"In the absence of a special zoning classification covering marinas, it is the Board's considered opinion that the subject properties should be reclassified to the C-2 zone to permit construction of the proposed facilities.

"The Board feels that the subject properties are ideal locations for a marina and restaurant and, further, that such proposed uses would be in keeping with the low-density pattern of development proposed in the Preliminary General Plan for this area.

"For these and other reasons in the general public welfare, and on motion duly made, seconded and carried, the Board recommends to the District Council that Prince George's Zoning Amendment Applications No. A-4470 and A-4479 be *APPROVED* for the C-2 zone."

The only testimony in the case dealing with the proposed marina and restaurant (as opposed to the proposed apartment project) was that of the witness Charles A. Chaney. A textwriter on the design, engineering, and planning of marinas, he testified that the need in the metropolitan Washington area for boating facilities was particularly acute: "We have now about 2,800 respectable slips in which to put our 16,000 boats, meaning that the Washington area is worse off than the majority of the country when it comes to the housing of this popular recreational means." He testified that the marina proposed for Swan Creek could possibly be constructed within the existing rural residential zone, under a special exception to the R-R classification. However, he testified that a C-2 zone would authorize the construction of more facilities desirable from the point of view of the boating enthusiast, such as a parts and accessories warehouse, a facility for major repairs, and gasoline and lubrication facilities. Mrs. Spellman, the dissentient Councilman, disagreed with the reclassification to the C-2 zone, but was willing to go along with a C-1 zone (a lighter commercial use).

The Maryland change-or-mistake rule is now breaking down under the renewed critical analysis of the high courts of our sister states. In *Gruber v. Mayor and Township Committee of Raritan Township*, 39 N. J. 7, 186 A. 2d 489 (1962), Justice Jacobs for the New Jersey Supreme Court said:

> "The comprehensive plan evidenced in the original zoning ordinance was not immutable and could reasonably be altered either because of changed circumstances, *or because of changed viewpoints as to the needs and interest of the entire community."* (p. 494 of 186 A. 2d). (Emphasis added).

The views of the Township Planning Commission embraced by the Supreme Court of Pennsylvania in its opinion in *Furniss v. Township of Lower Merion*, 412 Pa. 404, 194 A. 2d 926 (1963), are so instructive in this connection (and the Court's opinion so short, incisive, and amenable to common sense) that I have considered it my duty to set this gem out in full; it follows:

> "Bell, Chief Justice.
> "Neighboring property owners petitioned the Court of Common Pleas of Montgomery County to declare an ordinance invalid because the permit for an apartment house constituted ad hoc rezoning of 40 acres, and because it constituted a flagrant violation of the applicable Township Comprehensive Plan especially in regard to the density of population as set forth in the plan. The Planning Commission made the following apt statement:
> " '* * * a word should be said with respect to a misunderstanding which frequently arises in connection with the adoption of any comprehensive Plan for the Township. The thought has often been expressed that, once a Plan has been approved, all difficulties are eliminated. The answer to this is that no comprehensive Plan is perfect; it cannot possibly envisage all problems which will face the community in the future. To preserve the value and overall integrity of any

Plan *there must be a constant review of it* by the governmental authorities and their established agencies, having regard at all times, however, to the general objectives which have been determined. A Plan cannot remain static and at the same time be realistic, because the forces of growth, economic conditions, character and distribution of population and the *technique of planning are constantly in motion.'* (all emphasis supplied).

"It is a matter of common sense and reality that a comprehensive plan is not like the law of the Medes and the Persians; it must be subject to reasonable change from time to time as conditions in an area or a township or a large neighborhood change. Notwithstanding the able argument of appellant, we find no error of law or clear abuse of discretion.

"Order affirmed."

All of this may well be said of the 1957 Plan in Prince George's County.

In *Oka v. Cole,* 145 So. 2d 233 (Fla. 1962) the Supreme Court of Florida stated, in a four-to-three decision reversing the district court:

"Fundamental to the district court's conclusion is the assertion that an amendatory ordinance is unauthorized in the absence of a change in character and use of an area intervening between enactment of a comprehensive zoning plan and an attempted change or amendment. While such change is often the predicate for an amendment, we find no authority in our decisions or elsewhere to the effect that it is indispensable, that vested rights can accrue to neighboring owners, *or* that ordinances altering zoning restrictions are to be tested by any standard other than that applicable to zoning classification generally, i.e., that the restriction imposed shall not be arbitrary but reasonably related to the public health, safety, or welfare." (p. 235 of 145 S. 2d).

This decision was followed by the district court in *Chadwick v. Layton,* (D. Ct. of App., 1963, Allen, J.), 150 So. 2d 485 (Fla.-1963).

The Supreme Judicial Court of Massachusetts takes the same view. In *Raymond v. Commissioner, supra,* it said:

> "The petitioners stress that there have been few changes in the neighborhood since 1926 when the zoning ordinance was adopted. Such a factor, while relevant, is not controlling. It was one of several circumstances for the council to weigh and evaluate." (p. 191 of 131 N. E. 2d).

An even flatter statement was later made by that same court. In *Cohen v. City of Lynn,* 333 Mass. 699, 132 N. E. 2d 664 (1956), Justice Whittemore for the Court said:

> "It was appropriate in considering a zoning change to view the city as a whole [citing cases]. It is not necessary to find a substantial change in the locus to support a change in its zoning classification. See *Lamarre v. Commr. of Public Works of Fall River,* 324 Mass. 542, 547, 87 N. E. 2d 211; *Raymond v. Commr. of Public Works of Lowell,* 333 Mass. 410, 131 N. E. 2d 189." (p. 667 of 132 N. E. 2d).

Furthermore, the court refused to hold:

> "* * * as a matter of law that the particular restrictions of the new type zone were not at least as reasonably suited to the subject area as the superseded restrictions. Conceivably, the city council *could have believed* they were on the whole more suitable." (Emphasis added). (*Ibid.*).

To consider the converse of the case at bar (apartment zoning denied in pursuit of a well-balanced community), compare the statement of Chief Justice Weintraub in *Fanale v. Borough of Hasbrouck Heights,* 26 N. J. 320, 139 A. 2d 749 (1958):

> "Hence, although apartment houses were initially desirable, a municipality may later conclude that more

of them would be inimical to its total welfare. * * * It may change its ordinance in pursuit of a well-balanced community." (p. 752 of 139 A. 2d).

The case of *Kozesnik v. Montgomery Township*, 24 N. J. 154, 131 A. 2d 1 (1957) is equally instructive:

"The comprehensive plan embraced by an original zoning ordinance is of course mutable. If events should prove that the plan did not *fully meet or anticipate the needs* of the total community, amendments may be made, *Hochberg v. Borough of Freehold*, 40 N. J. Super. 276, 123 A. 2d 46 (App. Div. 1956), and if the ordinance as thus amended reveals a comprehensive plan, it is of no moment that the *new plan so revealed differs* from the original one." (Emphasis added) (p. 8 of 131 A. 2d).

The Supreme Court of Rhode Island in the *Hadley* case, *supra*, was faced with a statute purporting to grant unto the local legislative body power "from time to time to amend or repeal any such ordinance and thereby change such regulations or districts." The court expressed its point of view in these terms:

"We cannot agree, however, that the comprehensiveness contemplated in our enabling act either proscribes *basic changes* in the regulations contained in an ordinance or precludes such revisions thereof as contemporary circumstances and conditions may from time to time require. * * * Because of the provisions thus noted, it is our opinion that the phrase 'comprehensive plan' was not intended to preclude change and preserve inviolate use districts established in an original zoning ordinance, but that it contemplates revision and change in the regulations *to whatever extent that may be accomplished by a valid exercise of the police power delegated to the local legislature.*" (All emphasis supplied). (p. 152 of 198 A. 2d).

"The controlling question is not whether the amendment violates the comprehensive plan of the instant

ordinance in that it establishes a business district on land lying more than 300 feet from an arterial highway, but whether such establishment of a business district bears a reasonable relationship to the public health, safety, or welfare so as to justify the regulation inhering therein." (p. 153 of 198 A. 2d).

Kentucky takes the same tack. In *Leutenmayer v. Mathis*, 333 S. W. 2d 774 (1960), Commissioner Cullen stated:

"The determination having been made that this is not a spot zoning case, it is not necessary, in order to uphold the ordinance that there have been a showing of a change of conditions, since the enactment of the original comprehensive zoning ordinance [citing cases]. It is sufficient that the ordinance bears a reasonable relation to the general welfare and to an orderly plan of zoning development." (p. 776).

Just this past year, Chief Justice Bell of the Supreme Court of Pennsylvania wrote an able opinion expressing with precision my views concerning the flexibility to be permitted the legislative body when considering applications for rezoning; he said, for the court:

"A comprehensive plan does not contemplate or require a 'master plan' which rigidly provides for or attempts to answer in minute detail every possible question regarding land utilization or restriction. Neither a zoning ordinance nor a comprehensive plan is absolutely rigid, static and unchangeable; either or both may be amended, supplemented, changed, modified, or repealed—in the sound discretion of the legislative body and in accordance with statutory or other pertinent legal and Constitutional requirements—as conditions or changing circumstances may require."

*Cleaver v. Board of Adjustment*, 414 Pa. 367, 200 A. 2d 408 (1964).

The situation in the State of New York is a fascinating example of the growth of the law as declared by the common-law

courts. In *Hyde v. Incorporated Village of Baxter Estates,* 140 N. Y. S. 2d 890 (1955), affd. 2 A. D. 2d 889 (1956, mem.) affd. 3 N. Y. S. 2d 873 (1956, mem.), Justice Hogan, sitting in the Supreme Court, Special Term, invalidated an amendment to the Baxter Estates zoning ordinance, both on constitutional grounds and on the ground that rezoning was not lawful absent a showing of mistake in original zoning or a change in the conditions of the neighborhood. In adopting the Maryland Rule, he said:

> "The courts of sister states, in dealing with just such situations, have adopted a rule of property that *before property is rezoned there should be proof either that there was some mistake in the original zoning or that the character of the neighborhood had undergone such a substantial change as to warrant reclassification* (italics in original). In Temmink v. Board of Zoning Appeals, 109 A. 2d 85, 87, the Court of Appeals of Maryland said: [here follows an extensive quotation from Temmink].
>
> "See also *Caputo v. Board of Appeals of Somerville,* Mass. 120 N. E. 2d 753; *Zang and Sons, Builders v. Taylor,* 203 Md. 628, 102 A. 2d 723."

The Appellate Division affirmed the decision of Justice Hogan but expressly reserved the question of the Maryland Rule in these words:

> "In our opinion, on the record presented, the determination by the Special Term that the ordinance as amended restricted respondents' property to a use for which it is not reasonably adapted, is supported by substantial evidence. (Cf. *Mardine Realty Co. v. Village of Dobbs Ferry,* 1 A. D. 2d 789, affd. 1 N. Y. 2d 902). Accordingly, we do not reach the questions whether, as held by the learned Special Term, before property is rezoned there must be proof either that there was some mistake in the original zoning or that the character of the neighborhood had undergone such a substantial change as to warrant reclassification, and

whether there was proof of such mistake or change." (p. 890 of 2 A. D. 2d).

The Court of Appeals of New York affirmed both decisions but did not reach the issue of the Maryland Rule.

However, in *Levitt v. Village of Sands Point*, 6 A. D. 2d 701, 174 N. Y. S. 2d 283, affd. 6 N. Y. 2d 269, 189 N. Y. S. 2d 212, 160 N. E. 2d 501, the Maryland Rule and the adoption of it by the lower court in *Hyde*, were specifically disapproved. The case was tried before an Official Referee, whose findings and conclusions were effectuated by the trial court without opinion. Speaking of "the learned Official Referee" the Appellate Division stated:

> "He also indicated that he was in accord with the view that before property may be *rezoned*, as here, there should be proof either that there was a mistake in the original zoning or that there has been a substantial change in the character of the neighborhood warranting reclassification (cf. *Hyde v. Incorporated Vil. of Baxter Estates*, 140 N. Y. S. 2d 890, affd. 2 A. D. 2d 889, affd. 3 N. Y. 2d 873)."

The Appellate Division reversed a holding invalidating the amendatory ordinance there involved; the court agreed that appellees' property was not restricted to a use for which it is not reasonably adapted, but went on to say:

> "It is our opinion, however, that it may not be held on the record presented that respondents were deprived of their property without due process or that the ordinance is unconstitutional as arbitrary, capricious [citing cases], or without relation to purposes which appellants were authorized to effect [citing cases]. Neither are we in accord with the view that before an amendment to a zoning ordinance may be sustained there must be proof of mistake in the original enactment or a change in the character of the property involved in the reclassification (see Village Law §179; *Rodgers v. Village of Tarrytown, supra*, p. 121; *Pen-*

*taquit Assn. v. Furman,* 283 App. Div. 875)." (p. 701-702 of 6 A. D. 2d).

Amici Curiae in the Court of Appeals of New York urged the Court to hold that "the Official Referee erred in holding that there are other and different tests of validity to be applied to *amendments* to zoning ordinances from those applied to original enactments." The Court of Appeals (6 N. Y. 2d 269, 1959) per Froessel, J. agreed with the Appellate Division and with the *amici,* saying:

> "Even if the validity of the regulation were 'fairly debatable,' as plaintiffs' expert at the trial conceded it was, 'the legislative judgment must be allowed to control' (*Village of Euclid v. Ambler Realty Company,* 272 U. S. 365, 388). The presumption of validity is not changed by the fact that an amendment to a zoning ordinance is here involved (*Rodgers v. Village of Tarrytown,* 302 N. Y. 115, 121-123; *Shepard v. Vil. of Skaneateles,* 300 N. Y. 115, 117-118)." (p. 273 of 6 N. Y. 2d). (All italics original).

In 1961 this position was reiterated in the case of *McCabe v. Town of Oyster Bay,* 13 A. D. 2d 979, 217 N. Y. S. 2d 163, appeal dism. 10 N. Y. 2d 1011 (1961, per curiam), wherein the court stated:

> "In order to sustain the validity of the amendment, it was not essential that the town establish that there was a mistake in the original enactment or a change in the character of the property involved in the reclassification (*Levitt v. Incorporated Vil. of Sands Point,* 6 A. D. 2d 701, affd. 6 N. Y. 2d 269)." (p. 987 of 13 A. D. 2d).

The reliance by the New York courts on the landmark case of *Rodgers v. Tarrytown,* 276 App. Div. 1019, affd. 302 N. Y. 115, (1951) is not without its ironic aspects; as has been indicated, it was the *Rodgers* case upon which the Court of Appeals of Maryland so heavily relied in *Huff v. Board of Zoning Appeals,* 214 Md. 58, 133 A. 2d 83 (1957), a case wherein we

upheld the device of the "non-Euclidean" or "floating" zone, a device still considered revolutionary (see Haar and Hering, *The Lower Gwynedd Township Case: Too Flexible Zoning or an Inflexible Judiciary?*, 74 Harv. L. Rev. 1552 (1961)).

The Kansas City Court of Appeals in *Miller v. Kansas City*, 358 S. W. 2d 100 (1962, Sperry, Commissioner) also rejected the Maryland Rule:

> "Nor is it always necessary that a change in conditions be shown in order to justify a change in zoning. *Cianciarulo v. Tarro,* 168 A. 2d 719, 725 (R. I.). Here, the area is stagnated because of *what is now regarded* as unwise strip zoning. (Italics supplied). Conditions would seem to justify a re-examination of the situation and a change in zoning * * * if the council believed it to be for the general welfare." (p. 105).

In *Walker v. Town of Elkin,* 254 N. C. 85, 118 S. E. 2d 1 (1961), Justice Rodman for the North Carolina Supreme Court upheld the rezoning of a tract of 3.56 acres solely on the grounds of public need and desirability, and stated:

> "If the conditions existing at the time of the proposed change are such as would have originally justified the proposed action, the legislative body has the power to act." (p. 89 of 254 N. C.).[8]

---

**8.** In connection with the North Carolina court's position that an amendment is justified if the same action would have been proper as original zoning, one should carefully consider the impact on the Maryland Rule, of two (2) cases which, while stressing the need for showing change or mistake, give rise to a doctrine that might, for want of a better expression, be termed "conditional original zoning" or "original zoning subject to a condition subsequent".

In Mettee v. County Commissioners of Howard County, 212 Md. 357, 129 A. 2d 136 (1957) the County Commissioners zoned as "R" Residential (½ acre minimum lots) a tract of about 16 square miles under its comprehensive zoning plan of January 12, 1954. On July 27, 1954 the tract was rezoned to "RR" residential (1 acre minimum lots) zone—an action favored by 95% of the neighboring property owners who wished the area to retain, so far as possible, its rural character. At public hearings on the original zoning plan in

The Rhode Island case of *Cianciarulo v. Tarro,* 168 A. 2d 719 (R. I. 1961) deserves to be read in its entirety. (*Inter alia,*

---

January, uncontradicted testimony shows that the Commissioners announced their intention to zone the tract as "R" land (the lower classification), and asked the public to "allow us to go ahead and adopt this map," telling them to "petition us for a hearing" later, and that "they would give every consideration to an application for amendment." Various citizens accepted the invitation and did subsequently petition for amendment to an "RR" zone; on July 27th, 1954, the County Commissioners granted the petition for rezoning. This Court upheld the rezoning of July 27th, *not* on the theory that the Commissioners were simply correcting a "mistake" in the original zoning of January 12th, but rather that "the action on July 27th was thus simply a completion of the action begun in January and in substance a part of the original zoning" (page 367 of 212 Md.). The startling feature of the result of the case is the fact that the Court expressly recognized that the action of July 27th was not a mere substitution or effectuation *nunc pro tunc* of an earlier, already-agreed-upon decision that the 16 square miles ought to be "RR" instead of "R"—but rather that the hearing in July was a plenary re-inquiry into the entire matter, that the wide "difference of opinion lay in the views as to policy" and that "the issue [was] not only fairly debatable but was hotly debated" (p. 365 of 212 Md.). Further, the proper zoning of the 16 square miles was characterized by this Court as having been "left open" in January; and we said that the January classification was not "permanent and final" (p. 366 of 212 Md.).

Query: In the instant case, if the Tantallon developers had requested apartment zoning at the hearings on the original Regional District plan of 1957, but had been asked by the Council to "allow us to go ahead and adopt this map" (classifying the 650 acres here involved as RR rural residential), to defer their requests for the present and to "petition us for a hearing" in the future, and that the councilmen would "give every consideration to an application for amendment"—then, under the Mettee doctrine could we not hold that the RR classification adopted in 1957 was not intended to be "permanent and final," that the matter had in reality been "left open" for a future Council to ponder, and that the reclassification granted in 1964 was "simply a completion of the action" begun in 1957, "in substance a part of the original zoning"?

A time lag of six years in making "the final determination" was upheld under the circumstances of the second case, *Wakefield v. Kraft,* 202 Md. 136, 96 A. 2d 27 (1952). "In *Wakefield v. Kraft, supra* (p. 145), one of the points relied on to support a rezoning was the fact that Mr. Brooks, in a preliminary study, had put in a

it traces the adoption by the Connecticut Supreme Court of the Maryland Rule and its later repudiation by that court). To quote from just a fragment of that case:

> "It is our opinion then that the rule stated in *D'Angelo v. Knights of Columbus Building Ass'n., supra,* is that 'spot zoning,' while presumptively illegal, may constitute a valid exercise of the amendatory power when there is a substantial change of conditions in the involved area or where the original zoning was erroneous. But an amendment to a zoning ordinance that changes a zoning regulation that is not spot zoning as defined in the *D'Angelo* case *supra,* will not be held as an invalid exercise of the amendatory power of the local legislature only because a change of condition or a prior zoning error has not been shown." (p. 725).

While it should now be obvious that an increasing number of our sister states (those in which zoning is highly important) have specifically rejected the change-or-mistake rule when it has been argued to them, there may be as much, if not more, significance in the fact that "in the majority of states no reference is made of the necessity of such proof of mistake or changed conditions. * * *" 1 RATHKOPF, 27-17.[9]

---

commercial zone at the intersection in question, but omitted it in the approved plan because of doubt as to where the Columbia Pike would be relocated. It was argued that the change in classification merely supplied an omission in the original plan, despite the fact that it was there zoned as residential. It was held that the County Commissioners were not foreclosed from making the reclassification. Judge Hammond, speaking for the Court (p. 149) said: 'They recalled, undoubtedly, that it would have been done in 1948, if the relocation of the road then had been known. Thus, essentially, making the intersection Commercial A was part of an original comprehensive plan for uniform zoning of the whole County.' " (Quoted from Mettee, at page 367, Henderson, J.).

9. For examples: "If trends and economic changes of the times appear, the council's discretion to change its plan is quite broad and it may amend the general ordinance any time it deems circumstances and conditions warrant such action." Plaza Recreational Center v. Sioux City, 111 N. W. 2d 758, 766 (1961, Iowa).

"The validity of an amendatory zoning ordinance, with respect

It is my opinion that the Court's order, striking down the zoning for Tantallon, which one enthused witness said was "one of the outstanding projects in the United States," is out of step with the modern judicial approach, is harsh, and restricts progress.

## Part IV.

Having completed the attempt to show my reasons for opposing the (partial) reversal of the lower court's order, I now turn to a consideration of those parts of that order that the Court today affirms. I regret the necessity of further expanding an already lengthy opinion, but in view of my strong belief that the complexities of the situation have gone unnoticed by the Court, I feel constrained to add a few more words.

As Robert J. Carson makes clear, in his article entitled *Reclassification, Variances, and Special Exceptions in Maryland,* 21 Md. L. Rev. 306 (1961), there are a variety of sources from which local governmental units may derive their power to enact zoning legislation. In addition to any public local laws which may be in force in any given locality, the careful attorney must consult the Code, Article 66B, Sections 1-9 (incorporated cities and towns with more than 10,000 inhabitants); Article 66B, Section 21 et seq. (other incorporated areas); Article 25A, Section 5(U) (zoning powers of chartered counties). The three tracts in this case are situated in that part of Prince George's County within the Maryland-Washington Regional District; zoning legislation and judicial review thereof

---

to the exercise of the police power, must be determined by the same rules and tests as those applied in ascertaining the validity of original zoning ordinances * * *" Trust Company v. City of Chicago, 408 Ill. 91, 96 N. E. 2d 499, 504.

"We are of the opinion the governing body of a municipality may amend its zoning ordinances any time it deems circumstances and conditions warrant such action, and such an amendment is valid if the procedural requirements of the statutes are followed and it is not unreasonable or capricious nor inconsistent with the spirit and design of the zoning statute." Keller v. Council Bluffs, 66 N. W. 2d 113, 116. " * * * (T)he statute contemplates the same, careful, serious and intelligent consideration of an amendment to a zoning ordinance as in the preparation and enactment of an original ordinance on zoning" (p. 118).

are governed by the Laws of 1959, Chapter 780, now codified as Subtitle 59 ("Park and Planning Commission") of the Code of Public Local Laws of Prince George's County, 1963 edition.

We have had occasion before to consider the extraordinary provisions with respect to judicial review contained in Section 79 of the Act of 1959, now Subtitle 59-85(i) of the County Code.[10] In the case of *County Commissioners of Prince George's County v. Donohoe,* 220 Md. 362, 152 A. 2d 555 (1959) this Court noted the striking similarity between these provisions and the analogous provisions of the Administrative Procedure Act; Code, Article 41, Section 255(g). While recognizing the near-identity of the one law with the other, our holding there turned on the one marked difference between the two—the fact that a reviewing court under the Administrative Procedure Act may consider *"de novo* evidence taken in open court," while a reviewing court under the special bi-county law ordinarily may not consider or even admit such evidence, but should remand the case to the District Council, so that it may "have the benefit of the Council's judgment on the evidence * * * as the statute contemplated it should" (p. 371 of 220 Md.). We were faced in *Donohoe* with the constitutionality of that unique part of the 1959 law which purports to confer upon the Circuit Court the power to reverse or modify the District Council's decision if it is found to be "against the weight of competent, material and substantial evidence in view of the entire record, as submitted by the agency." Since we reversed on another ground (the propriety under the circumstances of taking *de novo* testimony

---

10. Subtitle 59-85(i) provides: "(i) *Court's action.* The court may affirm the decision of the district council or remand the case for further proceedings, or it may reverse or modify the decision if the substantial rights of the petitioners may have been prejudiced because the administrative findings, inferences, conclusions, or decisions are (1) in violation of constitutional provisions; or (2) in excess of the statutory authority or jurisdiction of the agency; or (3) made upon unlawful procedure; or (4) affected by other error of law; or (5) unsupported by competent, material and substantial evidence in view of the entire records as submitted; or (6) *against the weight of competent, material and substantial evidence in view of the entire record, as submitted by the agency; or* (7) arbitrary or capricious." (Emphasis supplied).

in the Circuit Court), we expressly reserved the constitutional issue, Chief Judge Brune saying for the Court, "We do not now reach the constitutional questions based upon separation of powers which the appellant has raised and we do not undertake to decide them." On three other occasions the Court was confronted with the same problem, but in all the four cases the Court has declined to pass upon it. See *Bishop v. Board of County Commissioners of Prince George's County,* 230 Md. 494, 500, 187 A. 2d 851 (1963); *Board of County Commissioners of Prince George's County v. Oak Hill Farms, Inc.,* 232 Md. 274, 277, 192 A. 2d 761 (1963); and *Board of County Commissioners of Prince George's County v. Levitt,* 235 Md. 151, 200 A. 2d 670 (1964).

In the *Bishop* case, we said simply:

> "One question of law which has been raised in the trial court has not been urged on appeal. We therefore do not decide it. \* \* \* That question was the validity or invalidity of [the County Code provision.] \* \* \* The trial court held this provision unconstitutional. The appellants do not challenge this holding and we, therefore, do not pass upon it" (p. 500 of 230 Md.).

In the *Oak Hill Farms* case we held that the Council's action was not supported by even fairly debatable evidence; Judge Hammond, for the Court, concluded: "In the view we take of the present appeal, again we do not need to determine the validity of the legislative grant to the court of the power to weigh the evidence before the District Council" (p. 277 of 232 Md.).

In the *Levitt* case (the converse of *Bishop*), we assumed the validity of the weight-of-evidence standard, Judge Prescott saying for the Court: "The appellant seeks to attack the constitutionality of Section 79(i)(5) and (6); however, this question was not raised or argued in the court below, hence, for the purpose of this appeal, we must consider them as valid enactments of law. Maryland Rule 885. \* \* \*"

*Dicta* in the *Levitt* and *Oak Hill Farms* cases suggest that the distinction between judicial review based on substantial evidence and that based on the weight of evidence, may be "tenuous" and the lines "difficult to delineate." I fully recognize

the truth of Chief Judge Sobeloff's observation in his dissenting opinion in *Wakefield v. Kraft*, 202 Md. 136, 154, 96 A. 2d 27 (1953) that many of our word-distinctions in zoning law have chiefly a "literary appeal" which offer little help in the solution of concrete cases. Also, I lend full credence to Professor Davis' observation, that in deference to the salutary principles of judicial self-restraint and comity among intra-governmental branches, that "even when the reviewing court deems itself free to substitute judgment, practical considerations may lead it to behave in about the same way it would if it deemed itself limited by the reasonableness test." Davis, *Administrative Law Text*, section 30.13 (1959). Notwithstanding this, however, I believe there is something to be said for the view that there may be a crucial theoretical difference between the two standards, a difference which may alter the ultimate results in a significant number of cases. Under the substantial evidence test (i.e., the fairly debatable test) the court considers whether the Council's finding is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Consolidated Edison Company v. NLRB*, 305 U. S. 197, 229 (1938). The Court does not necessarily have to believe that the Council's action was the best that could be rendered; indeed, it may even choke on it; but if it is based on substantial evidence, it must uphold it. *Offutt v. Board of Zoning Appeals*, 204 Md. 551, 105 A. 2d 219 (1954). If the court, however, is to decide where the weight of evidence lies, that is, which side preponderates, or to which side the balance tilts, the court will be able to decide each case according to its evaluation of the particular facts in that case.

A good critique of the "blending" approach is that of Leonard E. Cohen, *Some Aspects of Maryland Administrative Law*, 24 Md. L. Rev. 1 (1964), 40-42, writing after *Oak Hill Farms* but before *Levitt*. After thoroughly reviewing our language indicating that the difference between the two tests was "difficult to delineate" and that the line between them was "thin," the author comments as follows:

> "On the facts of the *Oak Hill Farms* case, this reasoning is understandable in that there was practically

no evidence to support the decision of the County Commissioners. The decision would have been reversible under either of the two tests. The question remains, however, whether the court will also equate the substantial evidence rule with the weight of the evidence rule in a case where the result could depend on which test is employed. To explain, first assume a set of facts similar to those in the *Oak Hill Farms* case. There are one hundred pieces of evidence in favor of proposition I and only one piece of evidence in favor of proposition II. Although there would be evidence supporting proposition II, it would clearly not be substantial evidence, considering the evidence to the contrary. Also, the weight of the evidence would clearly be in favor of proposition I. Next assume that five pieces of evidence favor proposition I and one piece of evidence favors proposition II. This is similar to the illustration given at the beginning of this section. It would seem that, even taking into account the contrary evidence, there would be substantial evidence supporting proposition II, assuming that the one piece of evidence is of a reliable nature. Nevertheless, it would also seem that the weight of the evidence is against proposition II. In this type of situation, the test employed would probably be determinative. If under these circumstances the Court of Appeals still equates the substantial evidence test with the weight of the evidence test, it would be ignoring the fact that the leading writers in the field of administrative law have recognized a meaningful difference between the two tests."

Delegation of legislative power is another question inherent in this unique County Code provision. The entire subject is a legal jungle; the only thing certain about it is that a "good court can lose its bearings because of the misleading generalities that fill judicial opinions on the subject of delegation." Davis, sec. 2.09.

The parties and the lower court are entitled to an adjudica-

tion of these issues. Good arguments can undoubtedly be marshalled for both sides of the constitutional issues posed by section 79 of Chapter 780, Laws of 1959. (cf. *Cromwell v. Jackson,* 188 Md. 8, 52 A. 2d 79 (1947), drawing a distinction between the constitutionality of two statutes, one of which conferred power upon Circuit Court judges to grant or deny liquor licenses in the first instance, and the second of which gave the judges power to review under broad standards the already-taken action by the liquor licensing board). The appellants thought they were entitled to avail themselves of the benefits of the contested statute; their petition for review in the Circuit Court asked a reversal of the Council's action on the ground that rezoning was against the "plain weight of the evidence." Since the Court wrote an opinion *affirming* the Council rather than *reversing* the Council, its failure to reach the question, as requested by the appellants, constituted plain error which may be recognized by this Court *ex mero motu.*

In my opinion, the question falls within the provision of Maryland Rule 885 which states, *inter alia,* "where a point or question of law was presented to the lower court and a decision of such point or question of law by this Court is necessary or desirable for the guidance of the lower court or to avoid the expense and delay of another appeal to this Court, such point or question of law may be decided by this Court even though not decided by the lower court." As already indicated, the appellants raised the question in their petition, but the point was not decided by the lower court. Judge Loveless carefully refrained from indicating his own view as to the weight of the evidence, stating only that "both proponents and opponents presented meritorious arguments"; that "a decision would be most difficult to make"; he concluded that there was substantial evidence upon which "a reasoning mind could reasonably have reached the decision of the District Council." (Indeed, at one point in his Opinion, he indicated that "the Court cannot substitute its opinion regardless of how it might feel"). The lower court, had it considered that Section 59-85 (i) (6) was a constitutional enactment, and then applied it, might well have concluded that the "weight of the competent, material, and substantial evidence in view of the entire record" supported the

District Council's action (this is my own view of the matter). I think the lower court (and this Court) should have passed upon those issues.[11]

But there is another reason, which justifies a decision of this issue: "the urgency of establishing a rule of future conduct in matters of important public concern." *Board of Education of Montgomery Co. v. Montgomery County*, 237 Md. 191, 195, 205 A. 2d 202 (1964). The situation is especially acute in Prince George's County, one of the two counties where it matters most. Judge Powers, one of the judges of the Seventh Judicial Circuit of Maryland, has declared the provision under discussion—part of a duly enacted special law providing for harmony and orderliness of development within the suburban Washington area—to be unconstitutional. See *Bishop v. Board of County Commissioners of Prince George's County, supra,* page 500 of 230 Md. If one will refer to the appellant's brief and record extract in that case, especially at pages 110 and 8, the following will appear: On page 110 Judge Powers summed up his views by saying: "It would be the taking over of a legislative function by the court and the court's legislating on zoning matters rather than the duly constituted Board." On page 8 he said: "It is the view of the Court that to make a determination of a zoning case decided by the District Council and then reviewed by this Court based on weight of evidence would be usurpation by the Court of the legislative function and result ultimately in the Courts in the County zoning property rather than the duly constituted Board." Enforcing his views, he de-

---

11. It is respectfully suggested that a happy solution of the entire problem would be the elimination of subsection (6) by action of the General Assembly. As noted above, it is reasonably arguable that a determination of the weight of the evidence is an inappropriate function for a reviewing court and may even be an invalid grant of legislative power. But even if subsection (6) is both valid and proper, the ability of the Circuit Court judge to make an effective decision on the weight of the evidence, at least to the extent that an intelligent decision depends upon an opportunity for personal observation and evaluation of witnesses, would appear to be severely limited by our holding in County Commissioners of Prince George's County v. Donohoe, 220 Md. 362, 152 A. 2d 555 (1959), discussed above.

clared: "Therefore, the determination of this case will not be made on the question of the weight of evidence. * * *" There is much to be said for his views. The very nature and quality of the proceedings had by an aggrieved party, however, may well depend upon whether his case is heard by an associate judge of the Seventh Judicial Circuit who shares and adheres to Judge Powers' holding. The appellant in the instant litigation, then, is entitled to have the matter resolved; and the same considerations which motivated our decision in *Board of Education, supra,* and more recently, in *Kardy v. Shook, J.,* 237 Md. 524, 207 A. 2d 83 (1964) should impel us to forego the position we have heretofore taken in *Bishop, Donohoe, Oak Hill Farms,* and *Levitt.* Specifically, I am of the opinion that the appellant is entitled to know whether or not he is entitled to seek a reversal by the Circuit Court for Prince George's County of a decision of the District Council on the ground that the Council's decision was against the weight of the evidence before it.

Finally, to put this dissenting opinion into perspective as an entirety, what has been said above, particularly what has been said in regard to the re-examination of existing theories (Part III) is not and cannot hope to be, an all-inclusive re-survey of the decisional law of zoning. Its treatment is wide-ranging, rather than exhaustive; its purpose, suggestive, and that only.

For all of the reasons above set forth, I respectfully dissent.